NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 180552-U

NO. 4-18-0552

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 22, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID J. DUNN, Defendant-Appellant. | ) Appeal from the<br>) Circuit Court of<br>) Champaign County<br>) No. 17CF433<br>)<br>) Honorable<br>) Thomas J. Difanis,<br>) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht concurred in the judgment.
Justice Turner specially concurred.

## ORDER

¶ 1    *Held*: (1) Defendant was proven guilty beyond a reasonable doubt of both aggravated criminal sexual assault and aggravated criminal sexual abuse in that the State sufficiently proved defendant knew the victim was unable to give knowing consent.

(2) Defendant could not demonstrate prejudice from counsel's failure to provide the jurors with headphones or from mischaracterizing certain evidence during his opening statement so as to sustain an ineffective-assistance-of-counsel claim.

(3) The trial court adequately admonished and questioned potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

(4) There was no violation of the one-act, one-crime rule.

(5) The trial court did not abuse its discretion in sentencing defendant to an aggregate prison term of 36 years.

¶ 2    Following a jury trial, defendant, David J. Dunn, was found guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)), two counts of aggravated criminal

sexual assault (720 ILCS 5/11-1.30(a)(7) (West 2016)), and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(7) (West 2016)). The trial court sentenced him to two consecutive terms of 15 years in prison and a consecutive term of 6 years in prison, for a total aggregate sentence of 36 years. Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt of aggravated criminal sexual assault and aggravated criminal sexual abuse; (2) his counsel was ineffective when he (a) failed to provide jurors with headphones so they could hear the victim's response to defendant's questions in the video recording of the incident and (b) mischaracterized the anticipated evidence during his opening statement; (3) the trial court failed to properly admonish and question potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (4) his aggravated-criminal-sexual-abuse conviction should have merged under the one-act, one-crime principles because the jury instructions and verdict form did not identify the alleged sexual conduct; and (5) his 36-year aggregate sentence is excessive given his lack of criminal history and exemplary career as a first-responder. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In April and May 2017, the State charged defendant with five offenses, all stemming from an incident that occurred between defendant and the victim, T.C., during the early morning hours of April 2, 2017. In counts I and II, the State charged defendant with criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)), Class 1 felonies, alleging he committed an act of sexual penetration with T.C. when defendant (1) placed his mouth onto T.C.'s penis (count I) and (2) inserted his finger into T.C.'s anus (count II) when defendant knew T.C. was unable to give knowing consent. In counts III and IV, the State charged defendant with aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(7) (West 2016)), Class X felonies, alleging he (1) made contact between his mouth and T.C.'s penis (count III) and (2) intruded a part of his body into

T.C.'s anus (count IV) and, as part of the same course of conduct, he delivered by injection, inhalation, ingestion, or any other means, ketamine, a controlled substance to T.C. without his consent and for other than medical purposes. In count V, the State charged defendant with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(7) (West 2016)), a Class 2 felony, alleging he knowingly touched or fondled T.C.'s sex organ for the purpose of sexual arousal or gratification and, as part of the same course of action, he delivered by injection, inhalation, ingestion, or any other means, ketamine, a controlled substance without T.C.'s consent and for other than medical purposes.

¶ 5        In May 2018, defendant's jury trial was conducted. During *voir dire*, the trial court advised the entire group of potential jurors of the four basic principles of law that apply to criminal proceedings. See *People v. Zehr*, 103 Ill. 2d 472 (1984). After a panel of four jurors was selected, the court instructed each panel separately and substantially as follows:

> "THE COURT: [T]he four of you understand that the defendant is presumed to be innocent of the charges against him. That before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. That the defendant is not required to offer any evidence on his own behalf, and if the defendant does not testify, that fact cannot be held against him in any way. The four of you understand those instructions; is that correct?
>
> * * *
>
> THE COURT: And they answer in the affirmative. And the four of you will follow those instructions; is that correct?
>
> * * *
>
> THE COURT: And again they answer in the affirmative."

- 3 -

¶ 6        During opening statements, the prosecutor explained that the charges in this case stemmed from an incident that occurred in defendant's bedroom after he had hosted "a lively" party at his residence in Savoy, which began on April 1, 2017. Approximately 30 people attended this going-away party for defendant, who had accepted a job in Alaska. The party involved "a lot of drinking" with "a substantial amount of party games and high jinks." The party lasted until approximately 4 a.m. on April 2, 2017.

¶ 7        During defendant's opening statement, counsel stated: "You'll hear evidence that at some point [the victim, T.C.,] earns a hundred dollars cash by putting on a skimpy jock strap, or what's described by one witness, Cody Fetzner, as men's lingerie, and jumps on another male. This was more than a wild party, this was a sexually charged party."

¶ 8        The State presented evidence from several partygoers. Fetzner, a 22-year-old student, emergency medical technician (EMT), and firefighter at the Savoy Fire Department (Savoy Fire), testified he attended the party at defendant's residence. He and T.C. were in the same hiring class at Savoy Fire. The party was in honor of defendant, as he was leaving Savoy Fire to accept a position as fire chief in Alaska. Fetzner and T.C. were roommates and "pretty good friends at the time." Defendant lived across the street from the firehouse and lived with other firefighters, Brian Peddycoart and Andrew Stewart, from Savoy Fire, so his house was considered a "hang-out." Fetzner said he rode with T.C. to the party and arrived sometime between 9 and 10 p.m. He and T.C. stayed outside in the garage, casually drinking, and watching games of beer pong. At some point, a group of 6 to 12 people, including himself, T.C., and defendant, walked across the street to Senator's, a "small pub bar." There, they continued drinking and participated in karaoke. Once the bar closed at 1 a.m., they went back to defendant's residence. Fetzner said he

and T.C. were "pretty well connected" throughout the night, meaning they stayed pretty close to each other. The following exchange occurred:

"Q. How intoxicated was [T.C.], in your view, at the time you were leaving the bar?

A. More drunk than I usually have seen [T.C.] This was certainly not our first time drinking together, but usually he's pretty—pretty—pretty stoic and reserved. So he, at this point, he was already kind of—I think we were, he—he was drunker than usual."

¶ 9 Once they returned to defendant's residence, they resumed drinking. He said: "And then there was kind of, I guess it was like a—like a dare almost starts going around for us to wear this reindeer mankini." Fetzner described the "mankini" as a piece of clothing that goes over the shoulders into a thong. Whoever would agree to put it on and run upstairs into Stewart's bedroom, where he and his girlfriend Whitney were sleeping, and "say something stupid," would get $100. T.C. accepted the bet. T.C. went into the restroom and changed into the mankini and disappeared upstairs, presumably into Stewart's bedroom, for approximately 15 seconds. T.C. came downstairs to everyone laughing, went into the restroom, and changed back into his clothes. Fetzner said the incident was "absolutely not" sexually charged. He said: "I mean, we're all a bunch of *** drunk firefighters. Just, it was just like a funny prank[.]" He said nothing about it was "inherently sexual."

¶ 10 Fetzner said defendant put on the mankini next. He went into the restroom, put it on, and ran upstairs to Stewart's bedroom. Stewart chased defendant downstairs. Defendant went into the restroom and changed back into his clothes. Fetzner was the next to put it on. He received $100 to wear it across the street to Carson Lewis's (another firefighter at Savoy Fire) residence. The whole group of attendees (approximately 12 at the time) followed Fetzner across the street.

Fetzner jumped onto Lewis's bed, waking him up. Fetzner said Lewis was not happy. Fetzner again denied that anything about the incidents could be described as "sexually charged."

¶ 11 Fetzner said he did not recall what time the party "eventually started to settle down." He and T.C. received Zofran pills, an anti-nausea medication, from defendant. Neither he nor T.C. were capable of driving home due to their intoxication, but Fetzner had planned to call an Uber. However, he could not get the app on his phone to work. Fetzner said:

> "At this point, [T.C.] is probably the drunkest I've ever seen him. He was, at some point started puking, which is only the second time I've ever seen [T.C.] puke after drinking. So he's puking into like a bucket, and eventually is sitting on a couch. And you know, he's like not even coherent at this point. I mean, he *** looked pretty bad."

Fetzner said he did not know how they would have even gotten T.C. into an Uber at that point. Fetzner realized Lewis and Ellie Walker had come over. They, along with defendant, were taking care of T.C. on the couch. Fetzner said he recalled T.C. getting a saline drip intravenously (an IV). He assumes defendant administered the IV since he was the only one qualified to do so. Fetzner said he was not surprised to see that T.C. had an IV, given everyone's medical backgrounds, as he knew hydration helped symptoms of intoxication. Fetzner said T.C. was "semi-conscious, at best." Peddycoart offered to let Fetzner sleep in his bed in a "very heterosexual instance." Fetzner did so and slept until 9:30 the next morning. Karthik Seetharaman had also stayed the night. He was sleeping on the futon in the hallway outside of Peddycoart's bedroom.

¶ 12 Fetzner said the next morning he expected to see T.C. on the couch but he was not there. Stewart and Whitney did not know where T.C. was either. Fetzner went across the street to the fire station to see if T.C. had slept in one of those bedrooms. He was not there. Fetzner went

back to defendant's house, sat on the couch, and texted T.C., but he got no response. Fetzner then opened the door to defendant's bedroom and found defendant asleep on the floor and T.C. laying in defendant's bed.

¶ 13       Fetzner said when T.C. finally exited the room, he "had like a glazed-over look in his eyes, definitely didn't appear well." He said he "[d]id not appear to just, you know was—was alarmingly hung over, or something, you know, something was awry, to say—the least." T.C. sat on the couch next to Fetzner. Fetzner began talking to others in the room but, it appeared, T.C. was "kind of eager to leave." T.C. asked Fetzner if he was able to drive home because he was not okay to do so. They stayed approximately 15 minutes before leaving.

¶ 14       The prosecutor asked Fetzner if he recalled any conversation at the party about the drug Cialis. He said he did not recall any mention of it at the party but he did recall defendant mentioning it one night at a restaurant after training. Defendant said he had unknowingly given Cialis to somebody at a party before.

¶ 15       During the ride home, T.C. told Fetzner generally what had happened to him. The prosecutor asked Fetzner to describe how T.C. was acting in the car. Fetzner said: "The way you would expect someone who's had a traumatic experience to react." Fetzner clarified his response by stating T.C. was in "shock, disbelief." Fetzner said he "was also in shock at that point, just alarmed." Fetzner told T.C., if he so desired, he should go to the hospital to have a rape kit done and that he would help him with contacting the police. But, Fetzner also told him that if he did not want anything to happen, he would "vow it to silence, and never speak about it." T.C. called his girlfriend and she took him to the hospital.

¶ 16       On cross-examination, Fetzner said he and T.C. hugged defendant before they left the next morning because they "both owed [their] careers at the fire department to [defendant]

because he was the one that had fought, apparently very adamantly for [them] to get on the department, even though [they] were five months late." Fetzner testified T.C. indeed hugged defendant "[v]ery uncomfortably[.]" Fetzner said the hug could be described as when someone was "not wanting to come into contact" with someone. It was not a close-up, slapping the back, holding close kind of hug.

¶ 17        Next, Stewart testified he was a full-time firefighter for the City of Urbana and a part-time lieutenant with Savoy Fire. As of April 1, 2017, he lived with Peddycoart and defendant. He knew T.C. and Fetzner as probationary firefighters. Stewart explained that every year Savoy Fire hired a new group of firefighters in November. They were considered probationary members for approximately one year while they were being trained. Defendant asked Stewart to hire T.C. and Fetzner a month or so late. He was not sure how defendant knew them. Stewart was reluctant because he would have to "catch them up" to the rest of the class and he did not have the time to do that. Defendant said he would "catch them up." So, under that pretense, T.C. and Fetzner were hired and defendant met with them for training.

¶ 18        Stewart testified defendant's going-away party on April 1, 2017, at their residence started as a "normal" party. He said, once the group decided to go to Senator's at approximately 11 p.m., he and his girlfriend Whitney Anderson decided to go to bed. Neither he nor Anderson drank alcohol that evening. When asked if he would characterize the party as being "sexually charged," he said, "[a]bsolutely not." Stewart testified he never saw anything "romantic or physically inappropriate" occurring that night or ever between T.C. and defendant.

¶ 19        Stewart testified he was in bed when he heard the group return from wherever they had been, presumably Senator's. Next, he heard "some shuffle" up the stairs, saw their bedroom door open, and T.C. entered two steps into the room with the mankini on. Stewart said he had

"choice words" and told T.C. to get out. He left. Stewart said he did not think T.C. jumped on him, as that would be something he would remember. He next heard defendant coming up the stairs, so he grabbed a long stick and waited. When defendant opened Stewart's door, Stewart "whacked him pretty good." Defendant retreated to the hallway.

¶ 20 The next morning, he recalled Fetzner trying to find T.C. Stewart said he and Anderson went to get coffee and when they returned, someone told Stewart that T.C. was in defendant's bedroom. Recalling the pranks from the night before, Stewart decided to "be the butthead that they were hours ago," so he went into defendant's room and turned on the light. He saw defendant on the floor and T.C. in defendant's bed. They were sleeping. Stewart did not recall seeing an IV in T.C.'s arm.

¶ 21 The next time Stewart saw T.C., he was sitting on the couch. Stewart said T.C. "looked bad." Stewart recalled that Walker, who was a prospective nursing student, was there and was "excited" about taking out T.C.'s IV. But, for whatever reason, defendant ended up removing the IV.

¶ 22 Stewart and Anderson left to visit Stewart's parents. On the way, Peddycoart, who was a dispatcher, sent Stewart a message asking what had happened last night. Stewart said Peddycoart said "something else was wrong." Stewart assumed someone had driven home intoxicated and "got a DUI." When he got home, Stewart saw defendant and Peddycoart and asked them to tell him what happened. They did not want to discuss it. A few minutes later, the police arrived at the house.

¶ 23 On cross-examination, Stewart emphatically denied that when T.C. came into his bedroom with the mankini on, he had straddled his face with his genitals.

¶ 24    Anderson, a full-time Champaign firefighter, part-time Savoy firefighter, and Stewart's girlfriend, next testified for the State. She described the party as a "drinking party." She said the party was not a "sexually charged" party. Instead, it "was just a bunch of friends hanging out, just playing games and drinking, I guess." She did not drink alcohol because she was not feeling well. She recalled the two separate instances when T.C. and defendant entered the bedroom, but she was facing the wall and did not roll over to see either one. No one jumped or climbed on the bed.

¶ 25    The next morning, she recalled seeing T.C. come out of defendant's bedroom holding an IV bag. T.C. looked like he "didn't feel well." She said he "just didn't seem like himself. Again, he just looked sick. He wasn't talking at all." She said T.C. went into the restroom and vomited. She saw no one else with an IV.

¶ 26    Adam Siero testified he was a full-time athletic trainer for the University of Illinois and a part-time firefighter for Savoy Fire. He and his wife Marissa attended defendant's party, arriving sometime between 8 and 10 p.m. Siero described the party as "pretty calm and relaxed" with "steady drinking over the course of the evening." He said he would not describe the party as "sexually charged." He and his wife were in the group that went to Senator's at approximately 12 a.m. There, they did shots and sang karaoke. They stayed for about an hour or until the bar closed.

¶ 27    Siero testified that, when they returned to defendant's residence, he recalled seeing the mankini, but he did not recall who brought it out. It became "kind of a dare" as to who would "put it on and run around." Siero said he paid defendant $100 to "put it on and to run around in it." The prosecutor asked Siero if there was "anything sexual in that interaction." Siero said "No. I thought it was more of a funny kind of dare, to see if he would actually do it, and to have him do it." He said, at one point, Fetzner had on the mankini and went across the street to Lewis's house.

A group, including Siero, accompanied Fetzner. Siero believed, but was not positive, Fetzner "busted in and turned the lights on, and started yelling and jumping on the bed[.]" Once they returned to defendant's residence, the party began "kind of winding down a little bit at that point." Siero said he fell asleep on the couch. At approximately 2 a.m., he and his wife took an Uber home. He did not recall seeing anyone with an IV. He described the partygoers as "pretty intoxicated," but "nothing that was really crazy, or sexual, or anything of that nature." Siero said he never observed, at the party or elsewhere, any romantic or physical intimacy between T.C. and defendant.

¶ 28    On cross-examination, Siero said the mankini, along with "a dildo and a pocket pussy" had been exchanged at the fire department's white-elephant Christmas party a few months prior. Siero said the mankini incidents were "definitely more of a prank than anything sexual at all." He did recall people filming the three individuals in the mankini.

¶ 29    Siero testified that he believed ketamine was kept in the drug locker at the Savoy firehouse, but only advanced life support (ALS) providers had access to it. He said: "Well, I don't know for a fact that ketamine is one of those drugs, but we do have ALS drugs, and that's where they are kept."

¶ 30    Marissa Siero testified consistently with her husband's testimony regarding the events of the evening. When asked if she would describe the party as "sexually charged," she said: "No, not at all." She described the events surrounding the mankini as "a big, silly, gag-joke thing."

¶ 31    Karthik Seetharaman, an EMT with Pro Ambulance at the time of the party, testified he knew most of the party goers as first-responders in the community. He testified he arrived at the party at approximately 9 p.m. and did not leave until the next morning. He said he was drinking and did not want to drive home after the party. He said he went to Senator's with the group but did not go to Lewis's house during the prank. He recalled seeing defendant offering

Zofran pills but was not aware of any other medications being offered. He did not see anyone getting an IV.

¶ 32        Seetharaman said he noticed T.C. appeared groggy after they returned from Senator's. As a "very sleepy" T.C. was sitting in the recliner in the living room, defendant undressed him, suggesting that he did not want T.C. to vomit on himself or his clothes. Seetharaman testified he went upstairs at approximately 2:30 a.m. to sleep on the futon in the loft area. The next morning, at approximately 10:30 a.m., Seetharaman went downstairs, spoke with Stewart and Anderson, and drove home.

¶ 33        Next, Peddycoart, a Metcad 911 dispatcher for the City of Champaign and defendant's roommate at the time of the party, testified about the events at the party. He characterized the amount of alcohol use as "moderate." He said he was included in the group that went to Senator's. Peddycoart recalled T.C. being at Senator's and described him as "pretty intoxicated" but nothing to cause Peddycoart any concern. Peddycoart described the mankini incidents as others had described them. He said Fetzner then put on the mankini and went to Lewis's house. Peddycoart said: "[Fetzner] walks into the bedroom and jumped up on [Lewis's] bed, I believe. And then [Lewis] started yelling to get out, so we all left and returned to our house." Peddycoart said he began cleaning up the house and tried to figure out where everyone was going to sleep. He said he last saw T.C. "sitting on the couch, somewhat, not unconscious, but not really with it." Peddycoart thought T.C. had "started to get sick, and at that point [defendant] started to attend to him." Peddycoart said defendant was physically holding T.C.'s head up so he could vomit. He said T.C. could not hold his head up on his own. He did not see any IVs being administered.

¶ 34 Peddycoart was at work the next day and took a call from the hospital regarding T.C.'s sexual assault report. Peddycoart contacted Stewart to tell him that T.C. was at the hospital and questioned whether he knew anything about that. Peddycoart left work at approximately 3 p.m., picked up his daughter, and headed home. Peddycoart found defendant asleep. He woke him up and "confronted him about if something had happened, trying to understand why [T.C.] would be there, what report [T.C.] would be making." Peddycoart said defendant "was very confused" and "couldn't recall anything." Peddycoart said he asked defendant whether he gave T.C. "a hand job, blow job, did [he] penetrate him in some sort of way, something that's misunderstood[.]" Peddycoart testified: "He didn't think that he did. He thought maybe a hand job if nothing else." Peddycoart said defendant "got sick" and was "upset." He asked whether he should contact the police. Peddycoart told defendant the police would contact him when they were finished speaking with T.C. Peddycoart testified defendant told him he had given T.C. an IV and Zofran pills. Peddycoart said he was not aware of any Cialis at the party. He said the officers arrived at their residence at approximately 7 p.m. Peddycoart said he did not see nor was he aware of the presence of ketamine in the house.

¶ 35 Lewis, a full-time telecommunicator with Arrow Ambulance and part-time EMT firefighter with Savoy Fire, testified about his involvement with the party. He was invited but did not initially attend due to a prior engagement. After he arrived home, he went over to defendant's party, but no one was there. He assumed they were at Senator's. Since it was close to closing time, he decided to wait until they returned to defendant's house. By 1:15 a.m., they had not returned, so he went to bed. He woke up to the group in his room and Fetzner "jumping on [his] bed over [him]" wearing a "singlet mankini-thing." He screamed at them to leave. Lewis said he could not fall back to sleep, so he went across the street to the party at approximately 2:15 a.m. He said

"everyone there [was] fairly inebriated." Lewis recalled a conversation about T.C. being uncircumcised. He said defendant "kept asking [T.C.] about his upbringing, his religion, and basically saying that it was interesting that he was uncircumcised, being Western and Catholic."

¶ 36      Lewis testified that when he first arrived at defendant's house, T.C. was standing upright and carrying on conversation casually. Later, within an hour, T.C. was sitting on a stool and "kind of started to slump over, [and] became less involved in the conversation. And was really starting to show the signs of more heavily [*sic*] inebriation." Lewis said he and defendant each took one arm and helped T.C. to the recliner. Lewis thought T.C. would not have been able to get to the recliner unassisted. Defendant suggested they remove T.C.'s clothes down to his underwear to avoid him vomiting on his clothes. T.C. began vomiting. Defendant said he was going to establish an IV and give him Zofran and fluids. Lewis watched defendant start the IV. Defendant had a vial of what he said was Zofran and put it into the IV. He then started a bag of saline. Lewis said, at that time, T.C. was groaning. He said T.C. was "not unconscious, but you can tell he's pretty out of it." Defendant said he would sleep on the couch and allow T.C. to sleep in defendant's bed. Lewis and defendant again each took an arm and lead T.C. to defendant's bed. At this point, T.C. was supporting less of his own weight than he did when they moved him to the recliner.

¶ 37      While on the bed, T.C. began shivering and moaning, and his lips were turning blue, as if he was cold. According to Lewis, this was not uncommon because the saline was colder than the body. Defendant twice retrieved a warm washcloth and put it under T.C.'s armpit. They covered T.C. with a blanket in the bed. Lewis said T.C. would "open his eyes and look around, but not really engaging [with] any one person, or place, or anything like that[.]" Defendant disconnected the empty saline bag but left the IV in T.C.'s arm, taping it down. Defendant thought he may have to administer "more fluids in the morning."

¶ 38 Lewis testified defendant was not very drunk at all. He was carrying on full conversations and was not slurring his words. He commented that he thought he was "starting to feel like he was sobering up." They put T.C. in the "recovery position," meaning on his left side, to prevent him from rolling onto his back and potentially aspirating on vomit. Defendant asked Lewis to go see where everyone else who was staying the night ended up. Lewis went upstairs and found Seetharaman asleep on the futon and both bedroom doors closed. He reported back to defendant and asked if he needed anything else. Defendant said he did not, so Lewis went home to bed at approximately 5 a.m. The last time Lewis saw T.C. that night, he was lying on his left side under a blanket but only wearing his underwear. The last time Lewis saw defendant that night, he was in his bedroom on his feet and relatively sober.

¶ 39 Walker, a full-time health care technician at Carle and part-time firefighter with Savoy Fire, testified that she arrived at the party at approximately 7:30 p.m. She had never observed anything of a romantic or physically intimate nature between defendant and T.C. She went to Senator's with the group. She described the mankini incidents as others had. She said she went to her condominium briefly and then returned to defendant's at approximately 2:30 a.m. She walked into the garage where defendant, T.C., Fetzner, Seetharaman, and Lewis were talking about circumcision. Walker said, at one point, defendant offered T.C. and Fetzner Zofran pills. She left the party at approximately 2:45 a.m. She returned mid-morning because she saw a lot of cars still at defendant's house. Fetzner and Seetharaman told her defendant and T.C. were in defendant's bedroom. She opened the door and found defendant laying on the floor behind the door and T.C. laying in the bed. T.C. had an IV with an attached bag. She could not recall where the bag was hanging, if it was at all, but she was certain the bag was there. Walker was talking to Fetzner in the living room when T.C. came out of the bedroom. She described him as "emotionless." She said

T.C. went into the bathroom "to throw up." Defendant removed his IV. She stayed to clean up for approximately 45 minutes, and she could not recall when T.C. and Fetzner left.

¶ 40        On cross-examination, Walker explained that defendant would often joke around with T.C. but she would not describe their interactions as "flirty." She said defendant "would interact with [T.C.] and [Fetzner] more than other—I mean, that's why they were at the party and other probationary members, from [her] knowledge, weren't invited."

¶ 41        T.C. testified he was 22 years old, an infantryman in the Army National Guard, a firefighter EMT with Savoy Fire, and EMT for Pro Ambulance. He knew defendant as his supervisor, the captain at Savoy Fire. He met defendant in November 2016 at the Savoy fire station when T.C. was doing a ride-along with Pro Ambulance in his pursuit of his EMT license. Once he and Fetzner began as probationers with the Savoy Fire, he established a professional yet friendly relationship with defendant. He said they "texted back and forth about stuff." The prosecutor asked if there was "ever any romantic entanglement of any kind" with defendant. T.C. responded: "Absolutely nothing, no."

¶ 42        T.C. said he and Fetzner drove to defendant's party in his car, parked in the Savoy Fire's parking lot, and walked across the street to defendant's residence. They arrived sometime between 8 and 10 p.m. They did not plan to spend the night at defendant's house. T.C. described the party as a "regular kind of antics party, where a bunch of firemen who, if you have been in the first[-]responder world or anything, you all like to have a good time because your job is stressful." He said he drank "quite a bit" of alcohol. At Senator's, he drank more and did karaoke. He said when they left Senator's, he was "very intoxicated." Once they returned to defendant's residence, defendant offered him $100 to put on the mankini. He did not think the request was sexual in nature. He said, "[I]t was just a dare."

¶ 43    After returning from Lewis's residence, he and others sat in the garage. He said, "that's when Zofran was being passed around." T.C. had never taken Zofran before, so he just trusted defendant when he identified it as such. T.C. described himself as "very intoxicated," and his "last exact memories are pretty much right there." He said he does not remember anything after the garage. He said his next memory is "hearing camera noises, and then being raped." When asked to describe what happened, T.C. testified as follows:

> "So I came to, at least I was able to open my eyes a little bit, and I could— I had what—my first memory is the camera noise, and that's what kind of brought me back. It sounded like everybody knows what the [iPhone] camera noise sounds like, like that fake shutter noise. And I heard that, and kind of came to a little bit. And I became aware that I didn't have any clothes on, so when I heard the camera noises I kind of tried to swat at it or anything, and I couldn't. I couldn't. I felt like I couldn't move, and I was paralyzed."

¶ 44    T.C. said he had been drunk before but this was "very, extremely different." He said his body was "extremely heavy." He said he was conscious and he knew what was going on but he could not move. He said his body did not work when he told it to "do stuff." He knew defendant was manipulating his penis while placing his fingers in T.C.'s anus. He heard defendant saying "weird stuff" to him like "come for me like you do for Gabby." T.C. said he absolutely did not consent to any sexual contact with defendant and did not consent to receiving any kind of controlled substance.

¶ 45    T.C. explained that defendant was "doing the masturbation activity" when T.C. raised his head to see him doing it. T.C. said he felt defendant's fingers inside his rectum at the same time. And, he said, defendant was using his mouth "to do oral things to [his] penis as well."

He said he could not react at all. He was consciously aware of what was going on, but he could not move, could not fight back, and could not stop it. He recalled that he needed to urinate. He did not think he was able to make it to the bathroom on his own. Once he got to the bathroom, he was unsuccessful. He explained that he did not know whether he was near a toilet or not, he was very confused, and his penis was painfully irritated and swollen. When asked if he was sexually aroused, T.C. said, "[No], this was horrifying. It wasn't sexual in my head."

¶ 46　　　　T.C. testified he recalled defendant administering IV fluids into his arm. They were in defendant's bedroom. The fluids made him feel cold. T.C. said, after they returned from the bathroom, T.C. laid on the bed on his back. He described the feeling of "advanced paralysis." He said his ears were ringing "really, really bad" and he felt like he was 10 feet above his body. He thought he was going to die. His next memory was waking up in the morning.

¶ 47　　　　The prosecutor showed T.C. a video that was taken in the bedroom. T.C. identified himself as laying supine on the bed with an IV in his arm. T.C. identified the person administering masturbation to him as defendant. The video showed T.C. make an arm movement, which he described as swatting motion, as he tried to swat at the camera when he heard camera noises. He said he remembers these events "very clearly," but he felt paralyzed and could not move. T.C. identified the noises on the video as defendant performing oral sex on him. He said: "I can't move, and I'm being raped." Lying next to him on the bed was a pink item and a bottle of lubricant. T.C. could not identify those items but he said, when he woke up, he felt covered in some kind of lubricant. The prosecutor asked him: "[W]as this consensual at all?" T.C. responded: "Not at all."

¶ 48　　　　The video showed T.C.'s hand dangling off the bed with no movement. On the video, defendant is whispering. T.C. said he was aware defendant was saying things but he "couldn't say anything back." The following exchange occurred:

- 18 -

"Q. Now [T.C.], you said, I want to pee, or I need to pee. The person who responds to you saying, 'You want to come, I know you do.' Who is that?

A. That's the defendant still.

Q. Did you say you wanted to come?

A. No.

[Video playing.]

Q. All right. There were six more statements from the defendant at this point. I presume that was the defendant—

A. Yes.

Q. —asking you if you wanted to come, talking about the size of your penis, and you didn't respond to any of those, did you?

A. No.

Q. Why not?

A. Because I couldn't."

¶ 49      T.C. said he recalled defendant agreeing to escort him to the bathroom but, according to the video, the sexual activity resumed with defendant asking T.C. if he wanted to come or pee. According to the video, T.C. said: "I want to do both," but he did not recall saying that. The prosecutor asked if that statement meant he was consenting to sex at that point. T.C. said: "Not at all." Defendant then said: "I'll stand you up." T.C. said he recalled falling at least once on his trip to the bathroom. He said he could not stand or walk on his own.

¶ 50      T.C. described the feeling of extreme fog when he woke up the next morning. He said it was not like a hangover but "something completely different." He said opening his eyes

"was really hard." He felt like he was under water. T.C. said he knew exactly what had happened to him. He described his feelings as follows:

> "I'm still processing what's going on, what had just happened. I was planning on what to do about it, and I wasn't about to come out, screaming, this is what happened, this is what happened, because I had still needed to take a breather, and figure out what the hell just happened to me.
>
> * * *
>
> I wanted to leave pretty bad, and just get out of that situation so I could again take a step back, take a breather, and figure out what to do."

¶ 51 T.C. told Fetzner on the way home that defendant had "done some stuff" to him. Once in his own bedroom, T.C. tried to "[f]igure out if [he] should go back and kill him or, go to the hospital." He decided to go to the hospital. He asked his girlfriend to come over right away. She did and drove him to the hospital.

¶ 52 Gabrielle Noreikaite (Gabby) testified that she and defendant had a dating relationship for a year and a half. When T.C. requested her immediate presence on April 2, 2017, she went to his house. She said he looked "really shaken" and scared. She said his "eyes were all puffy and red." Gabby asked T.C. if she could drive him to the hospital, and he agreed.

¶ 53 Investigator Dwayne Roelfs of the Champaign County Sheriff's Office testified about his interview with defendant on April 2, 2017. Roelfs described the interview as a non-custodial interview without the provision of *Miranda* warnings. Defendant agreed to make a voluntary statement. They spoke in defendant's attached garage in a video- and audio-recorded interview.

¶ 54    In this two-hour interview, defendant first denied any type of sexual activity. He said T.C. and Fetzner were going to take an Uber home but, when T.C. vomited on himself, they decided to stay. He thought he and Lewis took T.C. to the bathroom and then put him in defendant's bed. He said he could not remember whether he got in bed with T.C. or if anything happened in bed. He said he did not know why Peddycoart would have asked him if something sexual happened between him and T.C. Through tears, defendant questioned whether "he did something" to T.C.—he just could not remember. He said if he did do "something," then "how fucked up is that?" He said: "That's like monster shit." He said: "I'm scared for what I did, if I did something." He said: "If I remember going in there, I think I tried to give him a blow job or jacking him off. Honestly, I could see myself doing that." He said: "I can't remember if I asked him if he wanted me to stop or if he wanted to come." He said: "Obviously, I wouldn't try to pressure someone." According to defendant, he and T.C. had a conversation in the bedroom about what they wanted during this sexual encounter. He said he was trying to recall the details. The officer tried to understand how T.C. went from being so intoxicated he needed help to get to the recliner in the living room to improving enough to have sexual acts with defendant. The officer asked if T.C. had his "wits about him enough to consent?" Defendant said: "I would assume so." Defendant said there was an 85% chance that he initiated the sexual contact with T.C. but T.C. was also masturbating himself. He said if there was any penetration, it was only one finger. Defendant admitted to giving T.C. Cialis in his beer. Defendant stated that any substance that was in T.C.'s system came from defendant, although he denied giving him ketamine.

¶ 55    Next, forensic scientist Joshua Stern testified he tested the IV bags recovered from defendant's residence. In one bag, People's exhibit No. 10, he found the presence of ketamine.

Another forensic scientist, Alexandra Baluka, testified she tested T.C.'s urine sample and found the presence of ketamine.

¶ 56　　　　Dr. Brent Reifsteck, a pediatric hospitalist, testified about his familiarity with ketamine. He said ketamine was commonly used in pediatrics for sedation. He referred to it as a "good medication to use when you don't want to suppress the patient's ability to breathe on their own." He said, although each person is different, the general effects of ketamine are fairly standard. The most common way to administer ketamine is through an IV. It is considered a "date-rape" or "drug-facilitated-sexual-assault" type drug. Dr. Reifsteck testified as follows:

> "The way I explain ketamine to parents is kind of a good way to understand why it's also used by some folks as a date[-]rape drug. Ketamine in general disconnects the brain from the body chemically. So it's called a dissociative, because you basically are still there, and your eyes are open, but the higher function isn't connecting the brain to the body. So as an example, when I give, or when I start a sedation, the first medication I give is Versed, and right after I give that I tell the parents okay, the next medication I'm going to give is ketamine. Ketamine is an interesting drug, because it kind of disconnects the brain from the body. His eyes are going to be open, but he's really asleep. *** They're really not able to interact with you the way a fully awake person would."

The doctor explained that the body was still able to do some physical movements, even though "[he] wasn't there."

¶ 57　　　　Dr. Reifsteck testified he watched the video of T.C. in bed. In his professional opinion to a reasonable degree of scientific and medical certainty, T.C.'s reaction was consistent with having been given ketamine. He explained:

"He was, in the few moments where you could actually see him, he had his eyes open. He was making noise, but he wasn't engaging in actual back-and-forth, coherent sentences. He was, you know, it looked like he was trying to sit up, but then he kind of rolled back, like flopped back over. And that's actually exactly how the kids that I sedate with ketamine act."

¶ 58 The doctor also explained that a patient who has been given Cialis can have an erection without psychological stimulation. The drug provides the physical effect of an erection without the need for arousal.

¶ 59 After considering the evidence, closing arguments, and the jury instructions, the jury returned a guilty verdict on each count.

¶ 60 Defendant filed a posttrial motion for a new trial. He argued the trial court erred by (1) denying his motion *in limine* to bar references of Gabby as T.C.'s "girlfriend," (2) taking no action on potential juror misconduct, and (3) denying his motions for a directed verdict.

¶ 61 On July 3, 2018, the trial court considered and denied defendant's posttrial motion and proceeded with sentencing. The State presented no evidence in aggravation. Defendant presented "mitigation documents," character letters, and the testimony of two witnesses— defendant's sisters. First, Maureen Morin, testified to, in her opinion, defendant's exemplary character and extraordinary service as a first-responder. She believed "the party culture and alcohol" were the "true villain[s]" that evening. Next, Mindy McNeal, spoke of defendant's sexual orientation and his status as "asexual." His doctor prescribed testosterone due to his low levels. McNeal believed defendant's "sexual experience and side effects of the testosterone supplement may have contribute[d] to his current situation." In her opinion, defendant could never intentionally hurt anyone.

¶ 62 In his sentencing recommendation, the prosecutor noted that counts I and II should merge with counts III and IV, with count V being separate. Counts III and IV, both aggravated criminal sexual assault, are Class X felonies (720 ILCS 5/11-1.30(d)(1) (West 2016)), with a potential sentencing range of 6 to 30 years each in prison (730 ILCS 5/5-4.5-25(a) (West 2016)) and a requirement that the sentences run consecutively (730 ILCS 5/5-8-4(d)(2) (West 2016)). Defendant recommended a sentence of six years in prison on count III and six years in prison on count IV. Defendant argued count V should merge with counts III and IV because, according to him, the State had not alleged a separate sexual act in count V.

¶ 63 After considering the presentence investigation report, evidence in mitigation, T.C.'s victim-impact statement, defendant's statement in allocution, the statutory factors in aggravation and mitigation, and counsels' recommendations, the trial court sentenced defendant to two consecutive 15-year prison terms on counts III and IV and a consecutive 6-year term on count V. The court noted the "one obvious statutory mitigating factor" was defendant's lack of a prior criminal history, and the "only statutory factor in aggravation [was] the deterrent factor." The court stated its reasoning as follows:

> "Based upon the testimony, the evidence presented at trial, at some point in the evening in question, this defendant, by his own admission, put Cialis in the victim's beer. That was obviously designed for one purpose and one purpose only. The victim became intoxicated, the defendant then introduced ketamine into his system, and when the crowd dispersed, the defendant raped the victim and videotaped it, that reprehensible, deplorable offense. So the history, character, and condition of the defendant, in looking at the circumstances surrounding the offense,

indicates that a sentence in excess of the minimum on counts three and four is appropriate."

¶ 64        In July 2018, defendant filed a motion to reconsider his sentences, arguing that the sentence on count V violated the one-act, one-crime doctrine. He claimed the State failed to differentiate between the sexual conduct alleged in count V from that alleged in either counts III or IV.  In August 2018, the trial court denied defendant's motion.

¶ 65        This appeal followed.

¶ 66                                II. ANALYSIS

¶ 67                        A. Sufficiency of the Evidence

¶ 68        On appeal, defendant first argues the State failed to prove him guilty beyond a reasonable doubt of both aggravated criminal sexual assault and aggravated criminal sexual abuse. Specifically, he contends the State's evidence failed to show that he *knew* T.C. was unable to give knowing consent at the time the sexual acts were occurring.

¶ 69        The State has the burden of proving each element of a charged offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. When considering a defendant's challenge to the sufficiency of the evidence on review, this court "must determine whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* "It is not the role of the reviewing court to retry the defendant," and it is the trier of fact's responsibility "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* A reversal is warranted only when "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 70    Defendant was charged with aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(7) (West 2016)) and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(7) (West 2016)). "A person commits criminal sexual assault if that person commits an act of *sexual penetration* and *** knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." 720 ILCS 5/11-1.20(a)(2) (West 2016). "A person commits criminal sexual abuse if that person *** commits an act of *sexual conduct* and knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." 720 ILCS 5/11-1.50(a)(2) (West 2016). Each offense is considered an aggravated offense when "the person delivers (by injection, inhalation, ingestion, transfer of possession, or any other means) any controlled substance to the victim without the victim's consent or by threat or deception for other than medical purposes." 720 ILCS 5/11-1.30(a)(7), 11-1.60(a)(7) (West 2016). Defendant challenges only the second element of each primary offense, namely, whether the State proved beyond a reasonable doubt that defendant *knew* T.C. was unable to give knowing consent.

¶ 71    Although the Fifth District was analyzing a victim's consent in a context involving coercion or duress, rather than her physical or mental incapacity, the court nonetheless eloquently defined consent as follows:

> " 'Consent' implies a willingness, voluntariness, free will, reasoned or intelligent choice, physical or moral power of acting, or an active act of concurrence (as opposed to a passive assent) unclouded by fraud, duress or mistake. [Citation.] The ability to give knowing consent should involve more than measuring complainant's IQ or ability to physically resist [the] defendant. Knowing consent requires us to examine all of the circumstances to see if [the] defendant knowingly exercised such control over complainant that a trier of fact could find that

- 26 -

complainant did not submit to the sexual advances of [the] defendant voluntarily, intelligently, and by an active concurrence." *People v. Whitten*, 269 Ill. App. 3d 1037, 1044 (1995).

¶ 72 Thus, consent requires a "freely given agreement" to the sexual conduct at issue. *People v. Beasley*, 314 Ill. App. 3d 840, 845 (2000). And, "[l]ack of verbal or physical resistance does not constitute consent." *Id.* According to T.C.'s testimony, there was no question he did not consent to the sexual acts. But, due to his mental and physical state, he was unable to express his objection. However, the question on appeal is whether defendant *knew* T.C. was unable to give knowing consent.

¶ 73 "Knowledge of a material fact includes awareness of the substantial probability that the fact exists." 720 ILCS 5/4-5(a) (West 2016). In assessing whether a defendant acted with knowledge, we note that he need not admit that he acted with knowledge. See *People v. Lind*, 307 Ill. App. 3d 727, 735 (1999). Rather, whether a person acted with knowledge may be inferred from circumstantial evidence. *People v. Hall*, 273 Ill. App. 3d 838, 842 (1995). Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that, according to human experience, usually and reasonably follow. *People v. Grathler*, 368 Ill. App. 3d 802, 808 (2006) (citing *Hartness v. Ruzich*, 155 Ill. App. 3d 878, 882 (1987)). " '[I]nferences as to [a] defendant's mental state are a matter particularly within the province of the jury.' " *People v. Schmidt*, 392 Ill. App. 3d 698, 702 (2009) (quoting *People v. DiVincenzo*, 183 Ill. 2d 239, 253 (1998)). " 'The sole limitation on the use of circumstantial evidence is that the inferences drawn therefrom must be reasonable.' " *Grathler*, 368 Ill. App. 3d at 808 (quoting *Ruzich*, 155 Ill. App. 3d at 883).

¶ 74 The evidence presented at trial, both direct evidence and circumstantial evidence, plus the inferences drawn therefrom, would lead a reasonable jury to conclude defendant, in fact, knew T.C. was incapable of giving knowing consent to sexual acts. First, defendant admitted to putting Cialis in T.C.'s beer. A reasonable inference to be drawn from such conduct was that defendant wanted to ensure T.C. would have an erection later that night because defendant knew his plan included incapacitating T.C. Next, defendant knew T.C. was so intoxicated that he was unable to stand or walk on his own. Defendant removed his clothes because T.C. was unable to do so. Further, defendant knew T.C. was vomiting from being so intoxicated and therefore, believed T.C. would benefit from IV fluids and an anti-nausea medication. Lewis described T.C. as being "out of it," so, there is no reason not to believe defendant knew that as well.

¶ 75 Not only had T.C. been slipped Cialis and was very intoxicated, but he had also been given ketamine, as evidenced by the substance found in the IV bag and in his urine. It was reasonable for the jury to infer from the evidence that defendant administered ketamine through T.C.'s IV. It was also reasonable to assume, given defendant's medical background, that he knew exactly what ketamine would do to T.C. As T.C. described it, and as Dr. Reifsteck explained, T.C. was rendered helpless and motionless, yet he still had a sense of what was happening. T.C. testified he could do nothing to stop it. The jurors saw T.C.'s condition during the time in question on the video and could evaluate it for themselves. We find, based on the State's evidence, it was not unreasonable for the jury to infer that defendant knew exactly what these substances would do to T.C., his level of unconsciousness should have been apparent to defendant, and that defendant knew T.C. was unable to give knowing consent to any sexual acts.

¶ 76 Defendant has not demonstrated that the evidence, when viewed in a light most favorable to the State, was so unreasonable, improbable, or unsatisfactory to raise a reasonable

doubt as to defendant's guilt that defendant knew T.C. was unable to give knowing consent to the sexual acts.

¶ 77                                B. Ineffective Assistance of Counsel

¶ 78        Defendant next argues he was denied the effective assistance of counsel when counsel (1) failed to provide the jurors with headphones so they could have heard T.C.'s verbal request for continued sexual activity and (2) promised the jury they would hear evidence that T.C. donned lingerie and jumped on top of another man during a "sexually charged" party, when there was no such evidence.

¶ 79        To prevail on a claim of ineffective assistance of counsel, defendant must show both the performance of counsel was deficient and the deficient performance prejudiced him. *People v. Peel*, 2018 IL App (4th) 160100, ¶ 39. To show deficient performance, defendant must establish counsel's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). There is a strong presumption the challenged action or inaction was the product of sound trial strategy and not incompetence. *People v. Haynes*, 192 Ill. 2d 437, 473 (2000); see also *Peel*, 2018 IL App (4th) 160100, ¶ 39 ("Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective."). A defendant, however, may overcome that presumption if counsel's strategy choice "appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. King*, 316 Ill. App. 3d 901, 916 (2000).

¶ 80                                        1. *Headphones*

¶ 81        Defendant contends the jury was not presented with existing exculpatory evidence because counsel failed to ensure the jury had headphones with which to hear such evidence. On

the video recording of the sexual acts, defendant asked T.C.: "Do you want to come or go pee?" Defendant says: "I want to do both." According to defendant, the jury did not hear T.C.'s response because the only way to hear the response was with headphones. We disagree.

¶ 82        As the State points out, the jury was aware that T.C. made the comment, as it was addressed during T.C.'s direct examination. The prosecutor played the video, stopping periodically to ask T.C. questions. At one point, the prosecutor noted that defendant asked T.C. if he wanted "to come or go pee." T.C. said he did not remember saying he wanted to "do both." The prosecutor played that portion of the video again and asked T.C. to "[l]isten carefully." The prosecutor asked T.C.: "Assuming that you had made that statement, [T.C.], were you aware of what was going on? Were you consenting to sex at this point?" T.C. said: "Not at all."

¶ 83        Because the jury was fully apprised of defendant's question and T.C.'s answer, defense counsel had no reason to request that the jury listen to the recording with headphones. Further, defendant cannot demonstrate prejudice from this claimed error. Defendant's argument that this "could have tilted the balance in [defendant's] favor" is without merit when the jury heard the evidence and presumably determined the weight it should be given. Accordingly, defendant cannot demonstrate counsel was ineffective on this ground.

¶ 84                    2. *Opening Statement*

¶ 85        Defendant also contends his counsel was ineffective for promising the jury in his opening statement it would hear evidence that T.C. donned lingerie and jumped on top of another male at this "sexually charged" party. However, no such evidence was presented, as it appeared counsel mischaracterized the evidence. During his closing argument, the prosecutor reminded the jury of counsel's opening statement and explained that the person donning the "mankini" and

jumping on another man was Fetzner, not T.C. Defendant claims counsel's opening statement "raises serious questions about counsel's review of the audio visual evidence before trial."

¶ 86        Like his first claim of ineffective assistance, this claim fails as well. Defendant cannot demonstrate that counsel's opening statement prejudiced him. See *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 1 ("As prosecutors and criminal defense attorneys know, few assertions can wreck one's case more than an unfulfilled promise made to a jury in opening statements."). Even if we were to hold that counsel's conduct was unreasonable under the present circumstances, in light of the overwhelming evidence of defendant's guilt, discussed in more detail above, we would nevertheless find that defendant cannot satisfy the second prong of the Strickland test. See *Strickland*, 466 U.S. at 694; *People v. Bloomingburg*, 346 Ill. App. 3d 308, 317 (2004).

¶ 87        This was not powerful evidence that was promised and undelivered. In his opening, counsel said:

> "You'll hear evidence that at some point [T.C.] earns a hundred dollars cash by putting on a skimpy jock strap, or what's described by one witness, Cody Fetzner, as men's lingerie, and jumps on another male. This was more than a wild party, this was a sexually charged party."

¶ 88        The jury did hear evidence that T.C. earned one hundred dollars for putting on the mankini. However, it was not T.C. who "jump[ed] on another male"; it was Fetzner, a mischaracterization of the evidence. Describing the party as "sexually charged," was nothing more than counsel's characterization and opinion. Presumably, it was his way to prepare the jurors for the evidence and encourage them to view the party through that perspective. However, we cannot see how the mischaracterization of this evidence prejudiced defendant. This was not powerful

evidence that was promised and undelivered. It had little to do with the crux of the case—the video depicting T.C. in a disoriented and semi-conscious state.

¶ 89                                        C. Rule 431(b) Questioning

¶ 90        Under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the circuit court must admonish each potential juror on four constitutional principles that are essential to a fair trial. Also, the court must ask each potential juror if he or she understands and accepts those principles. The rule provides as follows:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." *Id.*

¶ 91        These are *Zehr* admonitions and inquiries, so named after *People v. Zehr*, 103 Ill. 2d 472 (1984). In the present case, *Zehr* admonitions were given, and *Zehr* inquiries were made. On appeal, however, defendant asserts violations of Rule 431(b).

¶ 92        Defendant acknowledges that, in the proceedings below, he never objected to any noncompliance with Rule 431(b), let alone reiterated the objection in a posttrial motion. "[B]oth a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue

for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, defendant seeks to avert the procedural forfeiture by invoking the doctrine of plain error. Defendant argues that that the evidence in the trial was "closely balanced" and that the "clear or obvious" violations of Rule 431(b) threatened to "tip the scale[ ] of justice against" him. See *People v. Sebby*, 2017 IL 119445, ¶ 48. In other words, the reputed errors, regardless of how serious they were in themselves, could have nudged the decision from not guilty to guilty, given the closeness of the evidence. The first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *Id.* ¶ 49.

¶ 93    According to defendant, the trial court clearly or obviously violated Rule 431(b) in two ways. First, the trial court asked the potential jurors if they would "follow" its "instructions" on the *Zehr* principles instead of asking them if they would "accept" those "principles." Under Rule 431(b), the court was supposed to "ask each potential juror, individually or in a group, whether that juror underst[ood] and *accept*[*ed*]" the *Zehr* "principles," not whether that juror understood and would "follow" "instructions" on the *Zehr* principles. (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Defendant cites *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35. There we stated: "Trial courts must exercise diligence when instructing the jury of the *Zehr* principles as codified in Rule 431(b) and must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in that rule."

¶ 94    In that judicial dictum, however, *McGuire* did not go so far as to say that any deviation from the precise language in Rule 431(b) necessarily was reversible error. There is, after all, an opinion by our sister court, *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2010), finding no error in the substitution of "follow" for "accept." The Second District held in *Atherton*: "[A]sking the potential jurors if they were 'willing to follow' the propositions was just another way of asking the potential jurors if they accepted those propositions. Thus, the trial court's questions as to those

principles complied with Rule 431(b)." *Id. Atherton* is directly on point, and we see no compelling reason to reject *Atherton*. After all, to "follow" means "to accept as authority." Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/follow (last visited Dec. 17, 2020). Taking our lead from *Atherton*, we find no error, let alone plain error, in the substitution of "accept" for "follow"—words that carry the same meaning.

¶ 95      The second error in the *Zehr* admonitions and inquiries, according to defendant, was lumping the four principles together instead of reciting one principle at a time and asking the potential jurors if they understood and accepted that principle. If indeed this was an error, it was not a clear or obvious one. Nothing in the text of Rule 431(b) clearly requires delivering the admonitions piecemeal with the inquiries interspersed. As defendant admits, the appellate court is divided on the question of whether it is necessary to do so. *Cf. People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97 (2010) (observing that "Rule 431(b) has no requirement that the trial court ask separate questions of the jurors about each individual principle"); *People v. Othman*, 2019 IL App (1st) 150823, ¶ 60 (holding that, after stating each of the four *Zehr* principles, the circuit court must ask the potential jurors if they understand and accept that principle, necessitating eight inquiries). Because it was not a clear or obvious error for the circuit to follow *Willhite* over *Othman*, the procedural forfeiture of this issue will be honored. See *People v. Albea*, 2017 IL App (2d) 150598, ¶ 17.

¶ 96      We must say by deviating from the "understand[ ] and accept[ ]" language that the supreme court prescribes in Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)), a trial judge unnecessarily introduces a defect into the proceedings that may well cause the conviction to topple on appeal, undoing all the time and labor that had gone into trying the case. And yet, in one appeal after another, we are asked to decide whether the alternative language the trial court chose to use

in its Rule 431(b) inquiries "substantially complied" with the rule, which comes down to deciding whether the language was "close enough." Consequently, a ridiculous new branch of case law has sprouted to adjudicate these semantic disputes. There is no excuse for failing to ask the potential jurors if they "understand[ ] and accept[ ]" the constitutional essentials of a fair trial. *Id.* This responsibility rests with the trial court and the prosecutor. As we often tell litigants, supreme court rules are not suggestions; they are commands, having the force of law. The supreme court commands in Rule 431(b): "The court shall ask each potential juror, individually or in a group, whether that juror *understands and accepts* the [*Zehr*] principles ***." (Emphasis added.) *Id.* That, simply, is what the court must do. Innovations and omissions in Rule 431(b) inquiries are irrational because they needlessly invite trouble—and trouble is surely what the prosecutor will receive when explaining to victims and the State's witnesses why a case has to be retried, if indeed it can be retried.

¶ 97 This court has recently and emphatically stated, and we repeat it here again:

"The issue in this case—namely, the failure of the trial court to strictly comply with Rule 431(b)—should never have arisen, and, indeed, should never arise in any case. That is because there is no excuse for a trial judge to not strictly comply with the clear and explicit directions the supreme court has provided for trial courts when admonishing prospective jurors.

Being a trial judge can be a difficult job, often requiring careful study to properly apply difficult legal concepts and to ensure that a jury is properly instructed on the law. However, admonishing prospective jurors pursuant to Rule 431(b) is not a difficult task.

It could hardly be easier." *People v. Neal*, 2020 IL App (4th) 170869, ¶ 188.

¶ 98                          D. One-Act, One-Crime

¶ 99          Defendant next argues his conviction for aggravated criminal sexual abuse violates

the one-act, one-crime rule. He alleges that conviction should merge with one of his two

convictions for aggravated criminal sexual assault because the jury instructions and verdict form

did not specify what alleged "sexual conduct" supported that count. It was possible, he claims, that

the jury found him guilty of aggravated criminal sexual abuse *and* aggravated criminal sexual

assault based on either his anal penetration or his oral stimulation.

¶ 100          Under the one-act, one-crime rule, "a criminal defendant may not be convicted of

multiple offenses when those offenses are all based on precisely the same physical act." *People v.

Coats*, 2018 IL 121926, ¶ 11. "[A]n 'act' [is] any overt or outward manifestation that will support

a separate offense." *People v. Crespo*, 203 Ill. 2d 335, 341 (2001). "For the State to properly obtain

multiple convictions for connected acts that might be treated as a series of offenses, the State must

apportion the acts to the offenses in the charging instrument and at trial." *People v. Williams*, 384

Ill. App. 3d 327, 340 (2008) (citing *Crespo*, 203 Ill. 2d at 345). "Whether a violation of the rule

has occurred is a question of law, which we review *de novo*." *Coats*, 2018 IL 121926, ¶ 12.

¶ 101          Defendant raises this issue for the first time in this appeal, and therefore, he has

forfeited review of the same. However, the plain-error doctrine permits our review. See *People v.

Harvey*, 211 Ill. 2d 368, 389 (2004) (the plain-error rule permitted review of the one-act, one-crime

issue because a violation and the potential for surplus conviction and sentence affected the integrity

of the judicial process).

¶ 102          Here, in count V, the aggravated criminal sexual abuse count, the State specifically

alleged defendant touched or fondled T.C.'s sex organ (the masturbation activity). In his closing

argument, the prosecutor specifically stated: "[W]hat we're talking about with aggravated criminal

sexual abuse is the masturbation activity." He continued: "So the penetration charges, the agg crim sex assaults relate to the oral and anal, and the agg crim sex abuse relates to the masturbation activity." The prosecutor made it perfectly clear to the jury. Thus, despite defendant's claim, it would be unreasonable to assume the jury ignored the prosecutor's explanation and failed to separate defendant's convictions into three separate acts. See *People v. Stull*, 2014 IL App (4th) 120704, ¶ 55 (no violation of the one-act, one-crime when the State "charged and argued" multiple offenses).

¶ 103                                      E. Sentence

¶ 104          Defendant claims the trial court erred in sentencing him to an aggregate term of 36 years in prison. Defendant equates his sentence to a *de facto* life sentence.

¶ 105          " 'The sentence imposed by the trial court is entitled to great deference and will not be reversed on appeal absent an abuse of discretion.' " *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 39 (quoting *McGuire*, 2017 IL App (4th) 150695, ¶ 38). This is because we recognize the trial court is in the best position to gauge a number of relevant factors when deciding an appropriate sentence, such as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56. Only when a sentence varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense can a trial court be found to have abused its discretion at sentencing. *Wheeler*, 2019 IL App (4th) 160937, ¶ 39. A sentence within the statutory guidelines provided by the legislature is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 106          In considering the propriety of a sentence, the balance to be struck amongst aggravating and mitigating factors is a matter of judicial discretion and should not be disturbed

absent an abuse of that discretion. *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24. "The weight to be accorded each factor in aggravation and mitigation in setting a sentence of imprisonment depends on the circumstances of each case." *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990). "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

¶ 107     The trial court sentenced defendant on the Class X felonies of aggravated criminal sexual assault to two consecutive 15-year terms in prison and a consecutive 6-year term in prison on the Class 2 felony of aggravated criminal sexual abuse. The trial court had no choice but to impose these sentences as consecutive. See 730 ILCS 5/5-8-4(d)(2) (West 2016). All three sentences were within the permissible statutory range. See 730 ILCS 5/5-4.5-25 (West 2016) (a Class X felony shall be no less than 6 years and no more than 30); 730 ILCS 5/5-4.5-35 (West 2016) (a Class 2 felony shall be no less than three years and no more than seven years). Thus, the possible sentencing range was between 15 and 67 years in prison.

¶ 108     Because defendant's sentence was within the permissible range, we begin with the presumption the sentence is proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46. Defendant claims, given his lack of a criminal history and his exemplary record of experience as a first-responder, the trial court abused its discretion in imposing a *de facto* life sentence.

¶ 109     In this case, the trial court noted it weighed defendant's exemplary history against the need for deterrence. The court noted it was taking the deterrent factor "very seriously," given the "incredibly serious," "reprehensible," and "deplorable" crimes defendant committed. Based on the record before this court, we do not find the sentence varies greatly from the spirit and purpose

of the law nor is it manifestly disproportionate to the nature of the offense. See *Wheeler*, 2019 IL App (4th) 160937, ¶ 39.

¶ 110    Reviewing courts have been instructed to proceed "with great caution" when asked to address the propriety of a defendant's sentence. *Fern*, 189 Ill. 2d at 53. We do so here. Further, we must be sure not to substitute our judgment for that of the trial court. *Id.* With these parameters in mind, we find no reason to disturb the trial court's sentence in this case. We cannot say the trial court abused its discretion in rendering its sentencing decision.

¶ 111                                  III. CONCLUSION

¶ 112    For the foregoing reasons, we affirm the trial court's judgment.

¶ 113    Affirmed.

¶ 114     JUSTICE TURNER, specially concurring.

¶ 115     I concur in the majority order affirming the trial court's judgment. However, I take no part in the majority's discussion in paragraphs 96 and 97.