NOTICE

Decision filed 04/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230219-U

NO. 5-23-0219

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 17-CF-433 |
| | ) | |
| DAVID J. DUNN, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the trial court's order dismissing the defendant's postconviction petition at the second stage for failing to make a substantial showing of a constitutional violation was correct, we affirm.

¶ 2    In the underlying criminal case, a jury found the defendant, David J. Dunn, guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)), two counts of aggravated sexual assault (*id.* § 11-1.30(a)(7)), and one count of aggravated criminal sexual abuse (*id.* § 11-1.60(a)(7)). On July 3, 2018, the trial court denied the defendant's motion for a new trial and sentenced him to two consecutive terms of 15 years in the Illinois Department of Corrections for two counts of aggravated sexual assault and a consecutive term of 6 years for the one count of aggravated criminal sexual abuse, for an aggregate sentence of 36 years. The court merged the two criminal sexual assault convictions into the two aggravated criminal sexual assault convictions.

1

The defendant appealed his convictions and sentence, which were affirmed by the Fourth District Illinois Appellate Court on January 22, 2021. *People v. Dunn*, 2021 IL App (4th) 180552-U.

¶ 3    This appeal involves the defendant's postconviction petition (filed on February 24, 2022), in which he raised a claim of actual innocence, multiple issues of ineffective assistance of trial counsel, and violation of his constitutional right to due process. As our review will necessarily mandate consideration of the underlying facts and evidence at trial to adequately assess the ineffective assistance claims, we utilize the background set forth in the Fourth District's order on direct appeal. For the reasons that follow, we affirm the trial court's second-stage dismissal of the defendant's postconviction petition.

¶ 4                                I. BACKGROUND

¶ 5    In April and May 2017, the State charged the defendant with five offenses, all stemming from an incident that occurred between the defendant and the victim, T.C., during the early morning hours of April 2, 2017. In counts I and II, the State charged the defendant with criminal sexual assault, Class 1 felonies, alleging he committed an act of sexual penetration with T.C. when the defendant (1) placed his mouth onto T.C.'s penis (count I) and (2) inserted his finger into T.C.'s anus (count II) when the defendant knew T.C. was unable to give knowing consent. In counts III and IV, the State charged the defendant with aggravated criminal sexual assault, Class X felonies, alleging he (1) made contact between his mouth and T.C.'s penis (count III) and (2) intruded a part of his body into T.C.'s anus (count IV) and, as part of the same course of conduct, he delivered by injection, inhalation, ingestion, or other means, ketamine, a controlled substance to T.C. without his consent and for nonmedical purposes. In count V, the State charged the defendant with aggravated criminal sexual abuse, a Class 2 felony, alleging he knowingly touched or fondled T.C.'s sex organ for the purpose of sexual arousal or gratification and, as part of the same course

2

of action, he delivered by injection, inhalation, ingestion, or other means, ketamine, a controlled substance without T.C.'s consent and for nonmedical purposes.

¶ 6     In May 2018, the case was tried before a jury. During opening statements, the prosecutor explained that the charges stemmed from an incident that occurred in the defendant's bedroom after he had hosted "a lively" party at his residence in Savoy, which began on April 1, 2017. Approximately 30 people attended this going-away party for the defendant, who had accepted a job in Alaska. The party involved "a lot of drinking" with "a substantial amount of party games and high jinks," and lasted until approximately 4 a.m. on April 2, 2017.

¶ 7     During the defendant's opening statement, counsel stated: "You'll hear evidence that at some point [the victim, T.C.,] earns a hundred dollars cash by putting on a skimpy jock strap, or what's described by one witness, Cody Fetzner, as men's lingerie, and jumps on another male. This was more than a wild party[;] this was a sexually charged party."

¶ 8     The State presented evidence from several partygoers. Fetzner, a 22-year-old student, and firefighter at the Savoy Fire Department (Savoy Fire), testified that he and T.C. were roommates and friends. Fetzner said he rode with T.C. to the party and arrived sometime between 9 and 10 p.m. after which they began casually drinking. At some point, a group of 6 to 12 people, including himself, T.C., and the defendant, walked across the street to Senator's, a bar where they continued drinking. At 1 a.m., they went back to the defendant's residence. Fetzner said he and T.C. were "pretty well connected" throughout the night, meaning they stayed close to each other. When asked about T.C.'s level of intoxication while he was at the bar, Fetzner answered:

> "More drunk than I usually have seen [T.C.] This was certainly not our first time drinking together, but usually he's pretty—pretty—pretty stoic and reserved. So he, at this point, he was already kind of—I think we were, he—he was drunker than usual."

¶ 9    After T.C. and Fetzner returned to the defendant's residence, they resumed drinking. Fetzner testified: "And then there was kind of, I guess it was like a—like a dare almost starts going around for us to wear this reindeer mankini." Fetzner described the "mankini" as a piece of clothing that goes over the shoulders into a thong. Whoever would agree to put it on and run upstairs into an occupied bedroom and "say something stupid" would get $100. T.C. accepted the bet and completed the challenge. Fetzner said the incident was "absolutely not" sexually charged. He said: "I mean, we're all a bunch of *** drunk firefighters. Just, it was just like a funny prank[.]" He said nothing about it was "inherently sexual."

¶ 10    Fetzner did not recall what time the party ended. The defendant gave Fetzner and T.C. Zofran pills, an anti-nausea medication. Neither he nor T.C. were capable of driving home due to their intoxication. Fetzner testified:

> "At this point, [T.C.] is probably the drunkest I've ever seen him. He was, at some point started puking, which is only the second time I've ever seen [T.C.] puke after drinking. So he's puking into like a bucket, and eventually is sitting on a couch. And you know, he's like not even coherent at this point. I mean, he *** looked pretty bad."

Two other attendees and the defendant were taking care of T.C. on the couch. Fetzner said he recalled T.C. getting a saline drip intravenously (IV). He assumed that the defendant administered the IV since he was the only one qualified to do so. Fetzner said he was not surprised to see that T.C. had an IV, given everyone's medical background, as he knew hydration helped symptoms of intoxication. Fetzner said T.C. was "semi-conscious, at best."

¶ 11    Fetzner testified that the next morning he expected to see T.C. on the couch but he was not there. Fetzner went across the street to the fire station to see if T.C. had slept in one of those bedrooms, but he was not there. Fetzner went back to the defendant's house, sat on the couch, and

4

texted T.C., but got no response. Fetzner then opened the door to the defendant's bedroom and found the defendant asleep on the floor and T.C. lying in the defendant's bed.

¶ 12    Fetzner said when T.C. finally exited the room, he "had like a glazed-over look in his eyes, definitely didn't appear well." He said he "[d]id not appear to just, you know was—was alarmingly hung over, or something, you know, something was awry, to say—the least." T.C. sat on the couch next to Fetzner. Fetzner testified that T.C. was eager to leave the defendant's house.

¶ 13    During the ride home, T.C. told Fetzner generally what had happened to him, and he testified that T.C. was behaving as someone who had experienced trauma would act and was in shock or disbelief. Fetzner told T.C. he should go to the hospital to have a rape kit done and that he would help him with contacting the police. T.C. then called his girlfriend who took him to the hospital.

¶ 14    Next, Andrew Stewart testified he was a part-time lieutenant with Savoy Fire. In April 2017, he lived with the defendant and one other friend. He knew T.C. and Fetzner as probationary firefighters. Stewart testified that the defendant's going-away party was held on April 1, 2017, at their house. Once the group decided to go to Senator's at approximately 11 p.m., he and his girlfriend went to bed. Stewart testified that he would not characterize the party as being "sexually charged," and he never saw anything "romantic or physically inappropriate" occurring that night or ever between T.C. and the defendant.

¶ 15    Stewart testified he was in bed when he heard the group return from the bar. Next, he heard "some shuffle" up the stairs, saw their bedroom door open, and T.C. entered two steps into the room with the mankini on. Stewart said he had "choice words," told T.C. to get out and he left. Stewart said he did not think T.C. jumped on him, as that would be something he would remember. The next morning, he recalled Fetzner trying to find T.C. He went into the defendant's room where

5

the defendant was on the floor and T.C. was in the defendant's bed, both asleep. After Stewart and his girlfriend left the house, he received a text from his third roommate alerting him that something bad had happened. When he returned home the police arrived.

¶ 16    Whitney Anderson, a part-time firefighter for Savoy Fire and Stewart's girlfriend, testified that the party was not "sexually charged." Instead, it "was just a bunch of friends hanging out, just playing games and drinking, I guess." The next morning, Whitney recalled seeing T.C. come out of the defendant's bedroom holding an IV bag. T.C. looked like he "didn't feel well." She said: "He just didn't seem like himself. Again, he just looked sick. He wasn't talking at all." She said T.C. went into the restroom and vomited. She saw no one else with an IV.

¶ 17    Adam Siero testified he was a part-time firefighter for Savoy Fire. He and his wife attended the defendant's party. He would not describe the party as "sexually charged," and never observed, at the party or elsewhere, any romantic or physical intimacy between T.C. and the defendant. Siero testified that he believed ketamine was kept in the drug locker at the Savoy firehouse, but only advanced life support (ALS) providers had access to it. He said: "Well, I don't know for a fact that ketamine is one of those drugs, but we do have ALS drugs, and that's where they are kept."

¶ 18    Karthik Seetharaman testified that he was an EMT with Pro Ambulance and knew most of the partygoers as first-responders in the community. He arrived at the party at approximately 9 p.m. and did not leave until the next morning. Seetharaman recalled seeing the defendant offering Zofran pills but was not aware of any other medications being offered. He said that he noticed T.C. appeared groggy after they returned from the bar. He testified that the defendant undressed T.C. in the living room, stating that he did not want T.C. to vomit on his clothes.

¶ 19    Next, Brian Peddycoart, a 911 dispatcher for the City of Champaign and the defendant's roommate in April 2017, testified that he was included in the group that went to Senator's.

6

Peddycoart recalled T.C. being at Senator's and described him as "pretty intoxicated" but nothing to cause any concern. Upon return to the house, Peddycoart testified that he cleaned up the house and tried to figure out where everyone was going to sleep. He last saw T.C. "sitting on the couch, somewhat, not unconscious, but not really with it." Peddycoart thought T.C. had "started to get sick, and at that point [the defendant] started to attend to him." Peddycoart said the defendant was physically holding T.C.'s head up so he could vomit because T.C. could not hold his head up on his own. He did not see any IV being administered.

¶ 20    Peddycoart was at work the next day and took a call from the hospital regarding T.C.'s sexual assault report. Peddycoart contacted Stewart to tell him that T.C. was at the hospital and questioned whether he knew anything about the assault. Peddycoart drove home and "confronted [the defendant] about if something had happened, trying to understand why [T.C.] would be there, what report [T.C.] would be making." Peddycoart said the defendant "was very confused" and "couldn't recall anything." Peddycoart said he asked the defendant whether he gave T.C. "a hand job, blow job, did [he] penetrate him in some sort of way, something that's misunderstood." Peddycoart testified: "He didn't think that he did. He thought maybe a hand job if nothing else." The defendant "got sick" and was "upset" and asked whether he should contact the police. Peddycoart told the defendant the police would contact him when they were finished speaking with T.C. The defendant told him he had given T.C. an IV and Zofran pills. Peddycoart had no knowledge of any ketamine at the house.

¶ 21    Carson Lewis, a part-time Savoy Fire EMT, testified that when he first arrived at the defendant's house, T.C. was standing upright and carrying on conversation casually. Later, within an hour, T.C. was sitting on a stool and "kind of started to slump over, [and] became less involved in the conversation. And was really starting to show the signs of more heavily [sic] inebriation."

Lewis said he and the defendant each took one arm and helped T.C. to the recliner. Lewis thought T.C. would not have been able to get to the recliner unassisted. The defendant suggested they remove T.C.'s clothes down to his underwear to avoid him vomiting on his clothes. After T.C. began vomiting, the defendant said he was going to establish an IV and give him Zofran and fluids. The defendant had a vial of what he said was Zofran and put it into the IV. He then started a bag of fluids. Lewis said, at that time, T.C. was groaning. He said T.C. was "not unconscious, but you can tell he's pretty out of it." The defendant said he would sleep on the couch and allow T.C. to sleep in the defendant's bed. Lewis and the defendant again each took an arm and led T.C. to the defendant's bed. At this point, T.C. was supporting less of his own weight than he did when they moved him to the recliner.

¶ 22    While on the bed, T.C. began shivering and moaning, and his lips were turning blue, as if he was cold. According to Lewis, this was not uncommon because the saline was colder than the body. The defendant twice retrieved a warm washcloth and put it under T.C.'s armpit. They covered T.C. with a blanket. Lewis said T.C. would "open his eyes and look around, but not really engaging [with] any one person, or place, or anything like that." The defendant disconnected the empty saline bag but left the IV in T.C.'s arm, taping it down. The defendant thought he may have to administer "more fluids in the morning."

¶ 23    Lewis testified that the defendant was not very drunk at all. He was carrying on full conversations and was not slurring his words. They put T.C. in the "recovery position," meaning on his left side, to prevent him from rolling onto his back and potentially aspirating on vomit. The last time Lewis saw T.C. that night, he was lying on his left side under a blanket but only wearing his underwear. The last time Lewis saw the defendant that night, he was in his bedroom on his feet and relatively sober.

¶ 24　T.C. testified he was 22 years old, an infantryman in the Army National Guard, a firefighter EMT with Savoy Fire, and an EMT for Pro Ambulance. He knew the defendant as his supervisor, the captain at Savoy Fire. He met the defendant in November 2016 at the Savoy fire station when T.C. was doing a ride-along with Pro Ambulance in pursuit of his EMT license. Once he and Fetzner began as probationers with Savoy Fire, he established a professional yet friendly relationship with the defendant. He said they "texted back and forth about stuff." The prosecutor asked if there was "ever any romantic entanglement of any kind" with the defendant. T.C. responded: "Absolutely nothing, no."

¶ 25　T.C. said he and Fetzner drove to the defendant's party in his car, arriving between 8 and 10 p.m. They did not plan to spend the night at the defendant's house. T.C. described the party as a "regular kind of antics party, where a bunch of firemen who, if you have been in the first responder world or anything, you all like to have a good time because your job is stressful." He said he drank "quite a bit" of alcohol at the defendant's house and at Senator's. He said when they left Senator's, he was "very intoxicated." Once they returned to the defendant's residence, the defendant offered him $100 to put on the mankini. He did not think the request was sexual in nature. He said, "[I]t was just a dare."

¶ 26　Later that evening, T.C. and others sat in the garage and "that's when Zofran was being passed around." T.C. had never taken Zofran before and trusted the defendant when he identified it as such. T.C. described himself as "very intoxicated," and his "last exact memories are pretty much right there." He said he does not remember anything after being in the garage. He said his next memory is "hearing camera noises, and then being raped." When asked to describe what happened, T.C. testified as follows:

"So I came to, at least I was able to open my eyes a little bit, and I could—I had what— my first memory is the camera noise, and that's what kind of brought me back. It sounded like everybody knows what the [iPhone] camera noise sounds like, like that fake shutter noise. And I heard that, and kind of came to a little bit. And I became aware that I didn't have any clothes on, so when I heard the camera noises I kind of tried to swat at it or anything, and I couldn't. I couldn't. I felt like I couldn't move, and I was paralyzed."

¶ 27    T.C. said he had been drunk before but this was "very, extremely different." He said his body was "extremely heavy," he was conscious and knew what was going on but could not move. He said his body did not work when he told it to "do stuff." He knew the defendant was manipulating his penis while placing his fingers in T.C.'s anus. He heard the defendant saying "weird stuff" to him like "come for me like you do for Gabby." T.C. said he absolutely did not consent to any sexual contact with the defendant and did not consent to receiving any kind of controlled substance.

¶ 28    T.C. explained that the defendant was "doing the masturbation activity" when T.C. raised his head to see him doing it. T.C. felt the defendant's fingers inside his anus at the same time. The defendant was using his mouth "to do oral things to [his] penis as well." He was consciously aware of what was going on, but could not move, fight back, or stop it. He recalled that he needed to urinate. He did not think he was able to make it to the bathroom on his own. Once he was in the bathroom, he testified that he did not know whether he was near a toilet or not, he was very confused, and his penis was painfully irritated and swollen. When asked if he was sexually aroused, T.C. said, "[No], this was horrifying. It wasn't sexual in my head."

¶ 29    T.C. testified he recalled the defendant administering IV fluids into his arm. They were in the defendant's bedroom. The fluids made him feel cold. T.C. said, after they returned from the

10

bathroom, he laid on the bed on his back. He described the feeling as "advanced paralysis." His ears were ringing "really, really bad" and he felt like he was 10 feet above his body. He thought he was going to die. His next memory was waking up in the morning.

¶ 30 The prosecutor showed T.C. a video that was taken in the bedroom. T.C. identified himself as lying supine on the bed with an IV in his arm. T.C. identified the person masturbating him as the defendant. The video showed T.C. make an arm movement, which he described as a swatting motion, as he tried to swat at the camera when he heard camera noises. He said he remembers these events "very clearly," but he felt paralyzed and could not move. T.C. identified the noises on the video as the defendant performing oral sex on him. He said: "I can't move, and I'm being raped." The prosecutor asked him: "[W]as this consensual at all?" T.C. responded: "Not at all."

¶ 31 The video showed T.C.'s hand dangling off the bed with no movement. On the video, the defendant is whispering. T.C. said he was aware the defendant was saying things but he "couldn't say anything back." The following exchange occurred during T.C.'s testimony:

"Q. Now [T.C.], you said, I want to pee, or I need to pee. The person who responds to you saying, 'You want to come, I know you do.' Who is that?

A. That's the defendant still.

Q. Did you say you wanted to come?

A. No.

[Video playing.]

Q. All right. There were six more statements from the defendant at this point. I presume that was the defendant—

A. Yes.

11

Q.—asking you if you wanted to come, talking about the size of your penis, and you didn't respond to any of those, did you?

A. No.

Q. Why not?

A. Because I couldn't."

¶ 32   T.C. said he recalled the defendant agreeing to escort him to the bathroom but, according to the video, the sexual activity resumed with the defendant asking T.C. if he wanted to come or pee. According to the video, T.C. said: "I want to do both," but he did not recall saying that. The prosecutor asked if that statement meant he was consenting to sex at that point. T.C. said: "Not at all." The defendant then said: "I'll stand you up." T.C. said he recalled falling at least once on his trip to the bathroom. He said he could not stand or walk on his own.

¶ 33   T.C. described the feeling of extreme fog when he woke up the next morning. He said it was not like a hangover but "something completely different." He said opening his eyes "was really hard." He felt like he was under water. T.C. said he knew exactly what had happened to him and described his feelings as follows:

"I'm still processing what's going on, what had just happened. I was planning on what to do about it, and I wasn't about to come out, screaming, this is what happened, this is what happened, because I had still needed to take a breather, and figure out what the hell just happened to me.

\* \* \*

\*\*\* I wanted to leave pretty bad, and just get out of that situation so I could again take a step back, take a breather, and figure out what to do."

12

¶ 34    T.C. told Fetzner on the way home that the defendant had "done some stuff" to him. Once in his own bedroom, T.C. tried to "[f]igure out if [he] should go back and kill him or, go to the hospital." He decided to go to the hospital and his girlfriend drove him there.

¶ 35    Investigator Dwayne Roelfs of the Champaign County Sheriff's Office testified about his interview with the defendant on April 2, 2017. The defendant agreed to make a voluntary statement, which was recorded. Roelfs described the interview as noncustodial without *Miranda* warnings.

¶ 36    Initially, the defendant denied any type of sexual activity. He said T.C. and Fetzner were going to take an Uber home but, when T.C. vomited on himself, they decided to stay. He thought he and Lewis took T.C. to the bathroom and then put him in the defendant's bed. He said he could not remember whether he got in bed with T.C. or if anything happened in bed. He said he did not know why Peddycoart would have asked him if something sexual happened between him and T.C. Through tears, the defendant questioned whether "he did something" to T.C.—he just could not remember. He said if he did do "something," then "how fucked up is that?" He said: "That's like monster shit." He said: "I'm scared for what I did, if I did something." He said: "If I remember going in there, I think I tried to give him a blow job or jacking him off. Honestly, I could see myself doing that." He said: "I can't remember if I asked him if he wanted me to stop or if he wanted to come." He said: "Obviously, I wouldn't try to pressure someone." According to the defendant, he and T.C. had a conversation in the bedroom about what they wanted during this sexual encounter. The officer asked if T.C. had the ability to consent to sexual contact due to his intoxication. The defendant said: "I would assume so." The defendant said there was an 85% chance that he initiated the sexual contact with T.C. but T.C. was also masturbating himself. He said if there was any penetration, it was only one finger. The defendant admitted to giving T.C.

13

Cialis in his beer. The defendant stated that any substance that was in T.C.'s system came from the defendant, although he denied giving him ketamine.

¶ 37    Next, forensic scientist Joshua Stern testified that he tested the IV bags recovered from the defendant's residence. In one bag, he found the presence of ketamine. Another forensic scientist, Alexandra Baluka, tested T.C.'s urine sample and found the presence of ketamine.

¶ 38    Dr. Brent Reifsteck, a pediatric hospitalist, testified about his familiarity with ketamine, which was commonly used in pediatrics for sedation. He referred to it as a "good medication to use when you don't want to suppress the patient's ability to breathe on their own." He said, although each person is different, the general effects of ketamine are fairly standard. The most common way to administer ketamine is through an IV. It is considered a "date-rape" or "drug-facilitated-sexual-assault" type drug. Dr. Reifsteck testified as follows:

> "The way I explain ketamine to parents is kind of a good way to understand why it's also used by some folks as a date[-]rape drug. Ketamine in general disconnects the brain from the body chemically. So it's called a dissociative, because you basically are still there, and your eyes are open, but the higher function isn't connecting the brain to the body. So as an example, when I give, or when I start a sedation, the first medication I give is Versed, and right after I give that I tell the parents okay, the next medication I'm going to give is ketamine. Ketamine is an interesting drug, because it kind of disconnects the brain from the body. His eyes are going to be open, but he's really asleep. *** They're really not able to interact with you the way a fully awake person would."

The doctor explained that the body was still able to do some physical movements, even though "[he] wasn't there."

14

¶ 39    Dr. Reifsteck testified he watched the defendant's video of T.C. In his professional opinion, T.C.'s reaction was consistent with having been given ketamine. He explained:

"He was, in the few moments where you could actually see him, he had his eyes open. He was making noise, but he wasn't engaging in actual back-and-forth, coherent sentences. He was, you know, it looked like he was trying to sit up, but then he kind of rolled back, like flopped back over. And that's actually exactly how the kids that I sedate with ketamine act."

¶ 40    The doctor also explained that a patient who has been given Cialis can have an erection without psychological stimulation. The drug provides the physical effect of an erection without the need for arousal.

¶ 41    The jury returned a guilty verdict on each count. The defendant's posttrial motion for a new trial was denied on July 3, 2018. The defendant's motion to reconsider his sentence was denied on August 2, 2018.

¶ 42    The defendant filed a direct appeal raising multiple issues including failure to prove his guilt beyond a reasonable doubt, ineffective assistance of trial counsel, improper admonishment of the jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), violation of the one-act, one-crime rule, and abuse of discretion in sentencing the defendant to an aggregate term of 36 years. The appellate court affirmed. *People v. Dunn*, 2021 IL App (4th) 180552-U.

¶ 43    On February 24, 2022, the defendant filed a verified postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)). He argued that he was innocent because of new evidence and information that someone else gave T.C. the ketamine and did not tell the defendant; thus, he truly believed that T.C. consented to their sexual encounter. The defendant also raised claims of ineffective assistance of trial counsel claiming that his attorney's

15

performance was deficient for failure to use readily available evidence to cross-examine the State's witnesses, failure to present witnesses that would have delivered favorable testimony for the defendant, and failure to obtain an expert on the effect of ketamine/alcohol intoxication on memory. The defendant also argued that the state's attorney violated *Brady v. Maryland*, 373 U.S. 83 (1963) (due process requires the prosecution to disclose evidence favorable to the accused and material to guilt or punishment), thereby denying the defendant of his constitutional right to due process and a fair trial.

¶ 44     The trial court found that the defendant's petition stated the gist of a constitutional claim and advanced the case to the second stage. The State filed a motion to dismiss on August 31, 2022, arguing that the defendant's claims of actual innocence were unsupported and conclusory, that his claims of ineffective assistance were forfeited as the defendant could have raised the claims on direct appeal and otherwise could not meet the *Strickland* standard of a substantial showing of error and prejudice. The defendant filed his written response on October 31, 2022. The trial court dismissed the petition on March 10, 2023, finding that the defendant's actual innocence claim was "speculative, conclusory and could have been raised on direct appeal." The court also concluded that there was insufficient proof that counsel's performance was deficient instead of driven by strategy. The trial court found that the defendant's *Brady v. Maryland* argument lacked merit because the claim could have been raised on direct appeal, the evidence at issue was in the defendant's possession and thus did not amount to *Brady* material, and the evidence had "minimal relevance" because the actions seen in the video did not convey T.C.'s consent to the defendant's assault.

16

¶ 45                                    II. ANALYSIS

¶ 46    The Post-Conviction Hearing Act provides a three-stage procedure by which a defendant may challenge his conviction based on allegations of a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the first stage, the postconviction court reviews the defendant's petition to determine whether it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2020); *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).

¶ 47    During the second stage, "counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition." *People v. Domagala*, 2013 IL 113688, ¶ 33; 725 ILCS 5/122-4, 122-5 (West 2020). "The second stage of postconviction review tests the legal sufficiency of the petition." (Internal quotation marks omitted.) *People v. Dixon*, 2018 IL App (3d) 150630, ¶ 12. At the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *Id.* "If the State moves to dismiss, the trial court may hold a dismissal hearing, which is still part of the second stage." *People v. Wheeler*, 392 Ill. App. 3d 303, 308 (2009). "The purpose of the first two stages is to determine whether an evidentiary hearing is even necessary." *People v. Fields*, 2020 IL App (1st) 151735, ¶ 42. To succeed at the second stage, the petition and supporting documentation must make a " 'substantial showing of a constitutional violation.' " *Domagala*, 2013 IL 113688, ¶ 33 (quoting *Edwards*, 197 Ill. 2d at 246). This court reviews the trial "court's dismissal of a postconviction petition at the second stage *de novo*." *People v. Addison*, 2023 IL 127119, ¶ 17; *People v. Childress*, 191 Ill. 2d 168, 174 (2000).

¶ 48    The Post-Conviction Hearing Act requires that "[the] petition [is] verified by affidavit" and that there are "affidavits, records, or other evidence supporting [the] allegations" attached to the petition "or shall state why the same are not attached." 725 ILCS 5/122-1(b), 122-2 (West 2020).

17

Allegations made by the defendant are taken as true unless the allegations are refuted by the record. *Domagala*, 2013 IL 113688, ¶ 35. If a petition is rebutted by the record or fails to allege sufficient facts to make a substantial showing of a constitutional violation it should be dismissed. *People v. Williams*, 209 Ill. 2d 227, 233 (2004).

¶ 49                                       A. Actual Innocence

¶ 50    To establish an actual innocence claim, a defendant must establish that the evidence is "newly discovered," material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32. "Newly discovered" evidence is that which "has been discovered since the trial and that the defendant could not have discovered sooner through due diligence." *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). Evidence is material if it is relevant and probative of the defendant's innocence. *Id.* "Evidence is considered cumulative when it adds nothing to what was already before the jury." *Id.* Finally, "the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *People v. Robinson*, 2020 IL 123849, ¶ 47. In other words, the evidence must raise "the probability that it is more likely than not that no reasonable juror would have convicted" the defendant. (Internal quotation marks omitted.) *Edwards*, 2012 IL 111711, ¶ 24.

¶ 51    The Illinois Supreme Court has acknowledged that the standard for an actual innocence claim "is extraordinarily difficult to meet." *People v. Coleman*, 2013 IL 113307, ¶ 94. The trial court, serving as the finder of fact, must consider whether the newly discovered evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. *Id.* ¶ 97. However, the court should not "redecide the defendant's guilt in deciding whether to grant relief." *Id.* The trial court should not assess the sufficiency of

18

the State's evidence to convict beyond a reasonable doubt because if that was required, the remedy would be an acquittal, not a new trial. *Id.*

¶ 52    The defendant argues two new pieces of evidence support his actual innocence claim: (1) a witness at trial, Carson Lewis, was investigated by the Illinois State Police for sexually assaulting young men prior to April 2017, one of whom alleged that during the assault he was unable to move, which the defendant argues was due to ketamine; and (2) a "new" opinion of a pharmacist, Dr. O'Donnell, who opined that if T.C. had ketamine in his system, he would not have been able to recall defendant sexually assaulting him.

¶ 53    The Illinois State Police received an anonymous claim that Lewis sexually abused three juveniles while they (D.C., D.S., and K.C.) and Lewis were employed as staff members at Camp Robert Drake in Vermilion County. On April 13, 2020, Illinois State Police Officer Arran Carr spoke with D.C. who denied any incidents with Lewis or knowledge of any incidents with Lewis. On April 14, 2020, D.S. spoke with Officer Carr and indicated that he had a consensual sexual encounter with Lewis. On June 15, 2020, Officer Carr and Sergeant Wendy Westfall met with and interviewed K.C. He informed the officers that there had been no sexually inappropriate incidents with Lewis, and that he knew of no inappropriate sexual behavior between Lewis and other camp staff members. However, he then proceeded to inform the officers of an incident that occurred when he was 17 years old. He was in a bar, very intoxicated, went home with Lewis, and sexual acts occurred. At one point, K.C. told Lewis to stop and he did. K.C. stated that while at Lewis's home, he could not move.

¶ 54    Thereafter, Officer Carr and Sergeant Westfall interviewed a young man named M.B., who indicated that when he and Lewis worked together at the camp, he could not recall Lewis engaging in sexually inappropriate behavior. However, at a New Year's Eve party in 2018, Lewis sat on

19

M.B.'s lap and kissed and touched him. M.B. reported that he pushed Lewis away, which ended the unwanted behavior.

¶ 55 The trial court took issue with the defendant's failure to attach any affidavits of Lewis's alleged victims. Moreover, the court noted that the interview information contained within the Illinois State Police investigation revealed different scenarios. None of the alleged victims mentioned ketamine, which was a critical element in the defendant's assault on T.C. The court also took issue with the defendant's speculative claim that Lewis had access to ketamine through his employment. The court indicated that there was no evidence in the record to support the defendant's claims that Lewis had a motive or opportunity to commit the crime against T.C. Finally, the court concluded that even if the allegations had merit, other crimes testimony would be inadmissible character evidence. The trial court also found that the defendant's new expert's claims about the effects of ketamine upon T.C. did not amount to new evidence but was simply a different conclusion. Further, the court found that this expert would not be able to draw the conclusions he reached because there was no evidence of the amount of ketamine given to T.C. on the night of the attack.

¶ 56 We agree with the trial court. The defendant failed to attach any affidavits from the four young men interviewed by the Illinois State Police. While he attached a copy of the interview reports, the affidavits of the alleged victims were critical to establish their statements under oath. See 725 ILCS 5/122-2 (West 2020) ("The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached."); see also *People v. Collins*, 202 Ill. 2d 59, 66 (2002) ("the failure to either attach the necessary 'affidavits, records, or other evidence' or explain their absence is 'fatal' to a post-conviction petition" (quoting *People v. Turner*, 187 Ill. 2d 406, 414 (1999))). We find that the defendant's actual innocence

20

theory is speculative, conclusory, and could have been raised on direct appeal. We find that the "new evidence" is not new and material and was clearly not conclusive such that the outcome of the case would have been different. *Edwards*, 2012 IL 111711, ¶ 32. Further, the conclusiveness required to establish actual innocence is absent since the defendant videotaped his sexual assault of T.C. and merely suggests that Lewis *might* have put ketamine in T.C.'s IV bag. Moreover, the incidents involving Lewis, except for M.B.'s claim, occurred before the trial in this case. The theory that Lewis administered the ketamine to T.C. could have been raised at trial and on direct appeal as ineffective assistance of trial counsel. Additionally, there is no evidentiary proof that Lewis administered the ketamine to T.C. Lewis testified at trial that his employer, Arrow Ambulance, stocked ketamine. Therefore, the fact that Lewis's employer had ketamine is not new evidence.

¶ 57    The defendant also claims that he discovered new opinion evidence from Dr. O'Donnell, a pharmacist. Dr. O'Donnell opined that due to the ketamine in T.C.'s system, T.C. would not have been able to recall any details of the sexual assault. First, the opinion of Dr. O'Donnell cannot be construed as new, since the defendant could have called Dr. O'Donnell as an expert witness at trial. We also note that without evidence of the amount of ketamine that was administered to T.C., Dr. O'Donnell's opinion that T.C. would have not been able to remember details of the assault is meritless. We agree with the trial court's decision that the defendant failed to make a substantial showing of a constitutional violation of actual innocence. *Dixon*, 2018 IL App (3d) 150630, ¶ 12.

¶ 58                    B. Ineffective Assistance of Trial Counsel

¶ 59    Constitutionally competent assistance is measured by a test of whether the defendant received "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Overall, to prevail on an ineffective-assistance-of-counsel claim, "[the] defendant must show that

21

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Lefler*, 294 Ill. App. 3d 305, 311 (1998) (citing *Strickland*, 466 U.S. at 694). The term "reasonable probability" has been defined to mean a probability sufficient to undermine confidence in the outcome of the proceeding. *People v. Colon*, 225 Ill. 2d 125, 135 (2007); *Lefler*, 294 Ill. App. 3d at 311-12 (citing *Strickland*, 466 U.S. at 687).

¶ 60    With a claim of ineffective assistance of counsel, we apply the two-prong *Strickland* test, adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Under this test, the defendant must prove that (1) defense counsel's performance was deficient or fell below an objective standard of reasonableness and (2) the defendant suffered prejudice because of defense counsel's deficient performance. *Strickland*, 466 U.S. at 687. If the defendant fails to establish either prong of the *Strickland* test, the ineffective assistance claim fails. *People v. Theis*, 2011 IL App (2d) 091080, ¶ 39. The reviewing court is not required to analyze both *Strickland* prongs and may conclude that the defendant failed to establish ineffective assistance because he was not prejudiced by counsel's alleged deficient performance. *People v. Perry*, 224 Ill. 2d 312, 342 (2007).

¶ 61        1. *Failure to Retain Expert to Testify on Effects of Ketamine and Alcohol*

¶ 62    The defendant failed to raise this issue on direct appeal, and it is forfeited. *People v. Tate*, 2012 IL 112214, ¶ 8. We decline to address the issue as plain error because even if we assume there was an error, the evidence in this case was not closely balanced, nor did the "error" affect the fairness of the defendant's trial. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Moreover, we find that trial counsel's failure to retain and call an expert on this issue was likely strategic in nature because if the expert opined that T.C. would not have been able to remember the assault, the sexual assault claim would have

22

been bolstered by T.C.'s inability to consent to any sexual activity. We conclude that the defendant fails to establish either *Strickland* prong. *Strickland*, 466 U.S. at 687.

¶ 63    2. *Failure to Cross-Examine T.C. Regarding Out-of-Court Statements*

¶ 64    The defendant failed to raise this issue on direct appeal, and it is also forfeited. *Tate*, 2012 IL 112214, ¶ 8. We opt to briefly consider the merits of this issue as forfeiture does not limit the court's consideration of the issue. *People v. Dobbins*, 2024 IL App (1st) 230566, ¶ 15. Generally, trial counsel's decisions in conducting cross-examination of a witness amounts to trial strategy and thus cannot support a claim of ineffective assistance of counsel. *People v. Anderson*, 266 Ill. App. 3d 947, 956 (1994). Here, the defendant argues that his attorney's approach was objectively unreasonable. *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997).

¶ 65    The statements at issue were made by T.C. the morning after the sexual assault at the emergency room, and his statements to police the same day. The statements involved T.C.'s claimed memory loss, whether he asked the defendant to stop the assault, his statement that the defendant only used his hand to touch T.C.'s penis, not stating that the defendant had anally penetrated him, and that he told the defendant during the assault to stop taking photographs. The defendant argues that had the jury heard these statements, which contradicted T.C.'s trial testimony, it would have determined that his testimony was unreliable.

¶ 66    We have reviewed the entirety of T.C.'s trial testimony and do not find that trial counsel was ineffective in failing to cross-examine him regarding these statements. First, there is no way to know how T.C. would have answered these questions. The defendant presumes that T.C. would not have been able to elaborate upon or explain the statements he made to emergency room staff and police officers. However, he did elaborate on cross-examination. At issue was T.C.'s memory given his intoxication both with alcohol and ketamine. T.C. testified about the limits of his recall,

23

including the facts that he had no memory after he was given Zofran in the defendant's garage, that he could not remember being assisted in moving from the kitchen to the living room, and that he could not remember having an IV started in the living room, but did remember receiving IV fluids in the bedroom. While the defendant's counsel could have seized upon some of these statements in cross-examination, having reviewed the entirety of T.C.'s direct and cross-examination testimony, we do not find counsel's performance to be objectively unreasonable. *Pecoraro*, 175 Ill. 2d at 326-27. We conclude that trial counsel's cross-examination constituted trial strategy and the missed topics of cross-examination specified by the defendant do not support a claim of ineffective assistance of counsel. *Anderson*, 266 Ill. App. 3d at 956.

¶ 67                                    3. "*Additional Errors*"

¶ 68    The defendant also makes multiple other claims of trial court error. First, he contends that trial counsel was ineffective for telling the jury, during opening statement, that they would hear that T.C., while wearing the mankini, jumped on another man, and therefore, the party was "sexually charged." However, no such evidence was presented. The opening statement issue was already addressed on direct appeal:

> "Defendant cannot demonstrate that counsel's opening statement prejudiced him. [Cite] Even if we were to hold that counsel's conduct was unreasonable under the present circumstances, in light of the overwhelming evidence of defendant's guilt, *** we would nevertheless find that defendant cannot satisfy the second prong of the *Strickland* test."
> *Dunn*, 20231 IL App (4th) 180552-U, ¶ 86.

The court concluded that counsel's assertion that the party was "sexually charged" was nothing more than his characterization and opinion. *Id.* ¶ 88. Second, he claims that the jurors should have been provided headphones at various stages of the case. Although raised on direct appeal, he raised

24

the issue again in his postconviction petition based on new evidence that because "witnesses" in the courtroom could not hear the video, the jury would likewise not have been able to hear the video. Third, he claims that his attorney provided ineffective assistance by failing to present evidence that the defendant did not have access to ketamine through his new employment in Alaska. Fourth, defense counsel did not object to the qualification of the pediatric physician who testified about the effects of ketamine and Cialis upon administration, arguing that from the defendant's "professional" experience he knew that the low amount of Cialis he put in T.C.'s drink would not have caused T.C.'s erection.

¶ 69     As stated earlier, there is no evidence that Lewis gave T.C. ketamine on the night of the sexual assault, or that he had used ketamine with prior victims. Similarly, while the defendant has "new evidence" that spectators in the gallery were unable to clearly hear the videotape, this issue was also raised on direct appeal. There is nothing in the record with which to conclude that the jury could not hear the audio from the recorded assault of T.C. The defendant asks this court to speculate that because two of his coworkers who were in the courtroom gallery could not hear the audio, the jury could not have heard it. We decline the invitation.

¶ 70     Next, the defendant contends that his trial counsel was ineffective for failing to call any witness to testify that the defendant had no access to ketamine via his new Alaskan employer. Initially, we note that the defendant has forfeited this issue by failing to raise it on direct appeal. *Tate*, 2012 IL 112214, ¶ 8. Although forfeited, we consider the issue as forfeiture does not limit the court's consideration. *Dobbins*, 2024 IL App (1st) 230566, ¶ 15. Moreover, while the failure to call a witness can amount to ineffective assistance of counsel (*People v. Butcher*, 240 Ill. App. 3d 507, 510 (1992)), we agree with the analysis of the trial court on postconviction review. Here, the State did not present evidence to confirm the source of the ketamine. The testimony that the

25

defendant now says should have been introduced at trial—that his new Alaskan employer had safety protocols in place to keep employees from accessing ketamine—only establishes that his new employer stocked ketamine. Far from proving that Lewis had no access to ketamine, this evidence would have suggested a possible source for the ketamine found in T.C.'s system. We agree with the trial court's statement that this evidence had the potential to harm the defendant had it been introduced at trial. Again, the defendant fails to establish that trial counsel's performance was deficient. *Strickland*, 466 U.S. at 687.

¶ 71    Finally, the defendant argues that his trial counsel was ineffective for not objecting to the qualifications of Dr. Brett Reifsteck, the physician who testified about the effects of ketamine and Cialis. This issue could have been raised on direct appeal, and thus it is forfeited. *Tate*, 2012 IL 112214, ¶ 8.

¶ 72                                    C. *Brady* Violation

¶ 73    The defendant next argues that his rights to due process and a fair trial were violated because the State failed to disclose materially favorable evidence on his iPhone 5. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Brady*, the United States Supreme Court held that the prosecution violates a defendant's constitutional due process rights by failing to disclose evidence favorable to the defendant and material to guilt or punishment. *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (citing *Brady*, 373 U.S. at 87). The *Brady* rule includes evidence known to the police investigators, but not to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). To comply with *Brady*, the prosecutor has an obligation to learn of favorable evidence known to other governmental entities, including the police. *Id.* at 437; see also *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (stating that a prosecutor's interest in a criminal case " 'is not that it shall win a case, but that justice shall be done' " (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935))).

26

¶ 74    A *Brady* claim requires the defendant to establish that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008) (citing *People v. Burt*, 205 Ill. 2d 28, 47 (2001)).

¶ 75    Evidence is deemed material if there is a reasonable probability that the result of the proceeding would have been different if the evidence was not disclosed. *Harris*, 206 Ill. 2d at 311 (citing *Kyles*, 514 U.S. at 434; *United States v. Bagley*, 473 U.S. 667, 682 (1985)). To establish materiality, an accused must show: " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *People v. Coleman*, 183 Ill. 2d 366, 393 (1998) (quoting *Kyles*, 514 U.S. at 435). "In making the materiality determination, courts must consider the cumulative effect of all the suppressed evidence rather than considering each item of evidence individually." *Beaman*, 229 Ill. 2d at 74 (citing *People v. Hobley*, 182 Ill. 2d 404, 435 (1998)).

¶ 76    In his brief, the defendant does not indicate what materially favorable evidence was on his iPhone 5, but states that from the outset, the "Defendant attempted repeatedly to have his iPhone 5 analyzed just as the iPhone 6 had been analyzed, but no comprehensive report was disclosed ***." He simply states that "exculpatory evidence existed on the iPhone 5, but it was never disclosed, prejudicing Defendant." The State argues that because the defendant did not raise this issue on direct appeal, it is forfeited. *People v. Myers*, 386 Ill. App. 3d 860, 864 (2008). The State also argues that because the defendant fails to set out what evidence was on his iPhone 5 that he claims was not disclosed to him, his brief violates the argument section of Illinois Supreme Court

Rule 341(h)(7) (eff. Oct. 1, 2020) (stating that the section of the appellant's brief include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor").

¶ 77 The trial court rejected the defendant's *Brady* claim finding that "the item was in Defendant's custody so it could not be *Brady* material. Even if such evidence existed, it is not of such [n]ature that it would likely change the outcome of the trial. Defendant's claims are speculative, conclusory and was/could have been raised on direct appeal."

¶ 78 In the defendant's reply brief, he directs this court to exhibits attached to his postconviction petition which contain information about the iPhone 5. The exhibits are the defendant's affidavit and internal police memos regarding the defendant's iPhone 5. Of importance is that the defendant does not definitively know if there was exculpatory evidence on the iPhone. He stated that after his iPhone 6 ran out of power, he picked up the iPhone 5 and continued filming his victim on the night of the sexual assault.

¶ 79 The defendant brought the iPhone 5 to his attorney's office. The attorney, Thomas Bruno, then emailed two men who were assigned to the case to tell them that he had the defendant's iPhone 5, that the defendant believed there were two exculpatory videos on the phone, and requested that the Champaign County Sheriff's Office forensically review the contents of the phone to locate the exculpatory videos. The defendant's iPhone 5 was secured by Champaign County officials and placed in an evidence locker.

¶ 80 On June 5, 2017, the forensic evaluation of the iPhone 5 was completed. The technician found nothing exculpatory on the phone, noting that the last photo was taken in March 2017 before the assault on T.C. However, he noted that there were two applications that were password protected that could conceivably contain the exculpatory video: PhotoVaultPro and Folder.

¶ 81    The defendant and his attorney met with law enforcement to discuss this second phone. The defendant could not remember which phone he used to film the exculpatory video. The video depicted T.C. "vigorously masturbating" and the defendant argued that because T.C. was masturbating, they were engaged in consensual sexual activity. The defendant provided law enforcement with the codes to access the applications on the iPhone 5.

¶ 82    A Champaign County Sheriff's Department employee was able to open both applications on the iPhone 5 with the codes provided by the defendant. There were 37 files on the phone. Each of the 37 files was labeled with a date. Upon restoring the photos to the phone by connecting the phone to the internet, the 37 files were able to be opened, and were reviewed. This employee later testified that after reviewing all the photos, none was exculpatory in nature.

¶ 83    While the defendant believes that the exculpatory video was on one of his iPhones, both phones were forensically examined by the State, and the alleged masturbation video was not on either phone. After thorough searches of the defendant's two iPhones, the alleged video was never located. Thus, the defendant's claim was rebutted by the record. *Domagala*, 2013 IL 113688, ¶ 35. As there was no exculpatory evidence found, there could be no *Brady* violation.

¶ 84                                    III. CONCLUSION

¶ 85    Because the defendant failed to make a substantial showing of a constitutional violation, the court's dismissal of his postconviction petition at the second stage was proper, and we affirm.

¶ 86    Affirmed.